WALLER, Chief Justice,
for the Court:
¶ 1. John Blakeney appeals the judgment of the Jones County Chancery Court granting Don and Carolyn MeRee’s petition to adopt his minor children and terminating his- parental rights. Finding no reversible error, we affirm.
*1156 FACTS & PROCEDURAL HISTORY
¶2. In July 2006, John and his wife Wanda were arrested for the murders of Willie Earl and Anita Kitchens, Wanda’s biological grandparents and legal parents. John confessed to the murders when he was arrested. Blakeney v. State, 29 So.3d 46, 48 (Miss.Ct.App.2009). John, Wanda, and their minor children A.B. and C.B.[1] lived with Willie Earl and Anita at the time of the murders. Id. According to John’s confession, Wanda decided to kill Willie Earl and Anita after getting into a dispute with them over money she owed them. Id. John purchased a TASER stun gun and planned to use it to kill Willie Earl, who had a weak heart. Id. On the morning of the murders, John shot the victims with the stun gun while they were sleeping. Id. at 49. When the shock did not kill them, John suffocated them with a garbage bag. Id. John then dressed the bodies, placed them in Willie Earl’s caí-, and drove the car out to Highway 84, east of Waynesboro, where he abandoned it. Id. John also unsuccessfully attempted to set the car on fire. Id. Wanda followed John in another vehicle. Id. John rode home with Wanda and then drove to Den-ham Springs, Louisiana, where he had reserved a hotel room. Id. A.B. and C.B. were present for the murders and rode with Wanda to pick up John after he had abandoned the victims’ bodies. Id. John ultimately was convicted of one count of murder and sentenced to life imprisonment, and Wanda was convicted of two counts of murder and sentenced to two consecutive life sentences.[2] Since John’s and Wanda’s arrests, A.B. and C.B. have lived with Carolyn McRee and her husband Don McRee. Carolyn McRee is Wanda’s biological mother and Willie Earl’s and Anita’s biological daughter. John and Wanda have not seen their children since their arrests.
¶ 3. On April 6, 2012, Don and Carolyn McRee filed a petition in the Jones County Chancery Court to adopt A.B. and C.B. Notably, the McRees’ adoption petition does not request the termination of John’s and Wanda’s parental rights. In response, John and Wanda requested the chancery court to issue a summons requiring the Mississippi Department of Corrections (MDOC) to secure their appearance before the court to answer the adoption petition. On June 11, 2012, the chancellor held a Rule 81 hearing. See Miss. R. Civ. P. 81. John appeared at the hearing and voiced his intent to contest the adoption. After the hearing, the chancellor entered an order appointing attorney Cecilia Arnold as guardian ad litem (“GAL”) for A.B. and C.B. and setting a trial date. The chancellor also entered an order instructing MDOC personnel to transport John to the Jones County Chancery Court for the trial.
¶4. The chancellor held a trial on the adoption petition on January 9, 2014. John and Wanda both participated in the trial, but neither was represented by counsel. Don and Carolyn McRee testified, and John and Wanda were allowed to cross-examine them. John and Wanda also were allowed to give statements to the chancellor. A.B. and C.B. did not testify, nor does it appear that they were present at the trial.
¶ 5. Also during the trial on the adoption petition, the GAL presented her report. *1157 During her investigation, the GAL learned that Don and Carolyn McRee were granted full custody of A.B. and C.B. immediately following John’s and Wanda’s arrests in 2006, and John and Wanda were ordered to have no contact with their children without court permission. John had procured a cell phone while he was incarcerated, and his parents had assisted him in talking to A.B. and C.B. by phone when they visited the children at Don and Carolyn McRee’s house.[3]
¶ 6. The. GAL never visited Wanda in prison, apparently because Carolyn McRee had told her that Wanda, did not plan to contest the adoption. However, the GAL did exchange several letters with Wanda. Wanda maintained that she did not kill Willie Earl or Anita. Wanda also stated that Carolyn McRee had told her that her children did not want to visit her because they “did not want to go to the prison.” The GAL learned that Wanda believed she would be released from prison at some point and her children would be able to return to her. However, she also believed that A.B. and C.B. were happy with Carolyn and Don McRee and were being raised properly. According to the GAL, Wanda did not seem to understand the permanent effects of an adoption.
¶7. The GAL interviewed John at the South Mississippi Correctional Facility in Leakesville. John had exhausted his state-court appeals but claimed he was working on a federal appeal, though he was not represented by an attorney at the time. John maintained that he had no part in Willie Earl’s and Anita’s murders, even though he had confessed to the crimes when he was arrested, had been convicted, and had lost‘his state-court appeal. John was afraid that Carolyn McRee was using the adoption proceeding to exact revenge on John for murdering her parents, but the GAL did not find any evidence supporting this fear. Like Wanda, John believed his conviction would be overturned and he would be able to care for the children- himself. John expressed concern that A.B. and C.B. would be in contact with Carolyn McRee’s ex-husband Garth Brewer, who he claimed was a child-molester. John did not.want his children’s last names changed,.nor did he want the children to be restricted from visiting him, but he was otherwise agreeable to the adoption at the time of the interview.
¶ 8. The GAL also interviewed Carolyn and Don McRee. Carolyn has four daughters of her own,.and Don has three daughters, whom Carolyn .adopted when she married Don. A.B. and C.B. have their own rooms at the McRees’ house, and they seemed to bond well with the McRees’ children. The GAL opined that the McRees appeared to have the financial and emotional resources needed to raise A.B. and C.B. Carolyn McRee .visited Wanda in prison every few months, but she did not take the children with her, and she did not talk about Wanda around the children. Carolyn McRee claimed that Wanda and John had not provided any financial support for the children since their arrests, though they did send birthday cards and occasional gifts. Carolyn McRee allowed John’s parents to visit the children, but she asked them not to allow the children to talk to John over the phone. She claimed that John’s parents abruptly stopped visiting about three years after John was corn victed. When the GAL interviewed John’s *1158 parents, they told her they stopped visiting because the MeRees had made their visits too difficult. . Carolyn McRee asserted that she maintains only minimal phone, contact with her ex-husband Garth regarding their own children, and that he was allowed to be in. contact with A.B, and C.B. only under adult supervision.
¶ 9. By the- time the' GAL interviewed A.B. and C.B., they had been in the custody of Don and Carolyn McRee for approximately eight' years. A.B. was nine years old, and C.B. was ten years old. Both children seemed to understand the adoption process and seemed to be excited about the prospect of being adopted. At the time of the murders, A.B. was two years old, and C.B. was three years old. A.B. claimed to remember witnessing the murders, but the GAL doubted that he had any independent recollection of the events. C.B. told the GAL that she did not remember anything about the murders, but Carolyn McRee told the GAL that C.B. previously had told her details about the murders that only an'éyewitness could know. Carolyn McRee also told the GAL that C.B. had suffered from nightmares for two weeks after the murders. C.B. underwent counseling for approximately a year after the murders. Carolyn McRee once overheard C.B. tell John over the phone that she wanted to live with him when he got out of prison. C.B. later told Carolyn McRee that she had told John what he wanted to hear because “he doesn’t know everything I know.”
¶ 10. At the conclusion of her report, the GAL recognized that John had been convicted of murder, was serving a life sentence, and had exhausted his state, appeals. She also voiced the belief that John’s chance of succeeding in a federal appeal without the assistance of an attorney was “slim to none.” After reviewing the documents and testimony she had collected, the GAL saw “no alternative except to terminate the parental rights of Wanda and John Blakeney to [C.B.] and [A.B.] and allow the children to be , adopted by Carolyn and Don McRee.” She also recommended that restrictions be put in place so Garth could not visit the children. .
¶ 11. At the conclusion of the trial, the chancellor made the following ruling:
Based on all the evidence before the Court it does appear that the parents of these children have been both convicted. One of them of one murder, and the mother has been convicted of two murders. They have been sentenced to a term of life in the — with the Mississippi Department of Corrections.
Although both of them are hopeful that something will happen that will result in their release and or exoneration, that’s unlikely. They have already appealed their convictions to the highest court of the State of Mississippi and they were ■affirmed. And they are currently both incarcerated.
There’s no way that these parents can raise these children. That’s simply impossible. Carolyn McRee is the legal biological grandmother of these children and she and her husband, Don, have had them in their home since July of 2006. They have come forward at this time and requested to be allowed to adopt the children. No one else has come before this Court to request that they be allowed to adopt the children or to visit with the children. ' •'
So based upon that evidence, these children need stability. And in order for that to occur, the Court’s going to approve the adoption.
The chancellor later entered an order granting the adoption, terminating John’s and Wanda’s parental rights and changing the children’s last names to McRee.
*1159 ¶ 12. John, proceeding pro. se, now appeals the chancellor’s final decree of adoption,[4] raising the following, issues:
I. Whether the chancellor erred in failing to appoint an attorney to represent John.
II. Whether the chancellor erred in terminating John’s parental rights.
III. Whether the chancellor erred in failing to address John’s pretrial motions, and whether the chancellor failed to consider alternatives to the adoption.
IV. Whether the chancellor erred in prohibiting John from calling witnesses at trial.
V. Whether the guardian ad litem failed in her duty to fully investigate this matter.
At this Court’s request, two attorneys designated by the Appellate Section of the Mississippi Bar filed an amicus 'curiae brief, pro bono publico, on the issue' of whether John was entitled to court-appointed counsel.[5]
STANDARD OF REVIEW
¶ 13. This Court’s standard of review concerning the termination of parental rights is well-established. “The chancellor’s findings of fact are viewed under the manifest error/substantial credible evidence test.” Vance v. Lincoln Cty. Dep’t of Pub. Welfare, 582 So.2d 414, 417 (Miss.1991) (citations omitted). Under this standard, “we will npt disturb the trial court’s findings of fact where there is ‘credible proof from which a rational trier of fact may have found [grounds for termination] by clear and convincing evidence.’ ” A.B. v. Lauderdale Cty. Dep’t of Human Servs., 13 So.3d 1263, 1267 (Miss.2009) (citing S.N.C. v. J.R.D., 755 So.2d 1077, 1080 (Miss.2000)) (quoting Ethredge v. Yawn, 605 So.2d 761, 764 (Miss.1992)). However, “[w]here & lower court misperceives the correct legal standard to be applied, the error becomes one of law, and we do not give 'deference to the findings of the trial court.” Brooks v. Brooks, 652 So.2d 1113, 1117 (Miss.1995). In such a case, the standard of review is de novo. Id. (citing Bank of Miss. v. Hollingsworth, 609 So.2d 422, 424 (Miss.1992)).
DISCUSSION
I. Whether the chancellor erred in failing to appoint an attorney to represept John.
¶ 14. Prior to the trial on the adoption petition, John filed a “motion for redress” asking the trial court to appoint an attorney to assist him in opposing the adoption. Neither John?s motion nor the chancellor’s response to the motion appears in the récord, and the only mention of this issue occurred during trial, when John stated, “I had requested counsel help somehow, but' I failed to receive it. So I’m — I really don’t know how to go about this so — you have to beg my forgiveness if I’m doing it wrong.” On appeal,- John argues that the chancellor erred in failing to appoint an attorney to represent him at the trial on the adoption petition.
¶ 15. The United States Supreme Court has held that the Due Process Clause of the Fourteenth Amendment to the United States Constitution does not automatically entitle indigent parents to court-appointed counsel in termination proceedings. Lassiter v. Dep’t of Soc. Servs. of Durham *1160 Cty., N.C., 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). In Lassiter, the Court found that, in some termination cases, the net weight of a parent’s interest in the accuracy and justice of a decision concerning his or her parental rights, the State’s interest in protecting the welfare of the child, and the risk of inaccurate or unjust decisions could overcome “the presumption that there is no right to counsel in the absence of at least a potential deprivation of physical liberty.” Id. at 27-32, 101 S.Ct. 2153 (citing Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). However, “since ‘due process is not so rigid as to require that the significant interests in informality, flexibility and economy must always be sacrificed,’ ” the Court could not say that due process required the appointment of counsel in every parental termination proceeding. Id. at 31-32, 101 S.Ct. 2153 (quoting Gagnon v. Scarpelli, 411 U.S. 778, 788, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973)). Instead, the Court “[left] the decision whether due process calls for the appointment of counsel for indigent parents in termination proceedings to be answered in the first instance by the trial court, subject, of course, to appellate review.” Id. at 32, 101 S.Ct. 2153. In affirming the trial court’s denial of an indigent parent’s request for court-appointed counsel, the Lassiter Court relied on the following instructive factors: (1) whether the case involves “allegations of neglect or abuse upon which criminal charges could be based;” (2) whether expert testimony will be offered; (3) whether the case involves “specially troublesome points of law, either procedural or substantive;” and (4) whether the presence of counsel “would result in a determinative difference in the proceedings.” Id. at 32-33, 101 S.Ct. 2153. This Court has adopted these factors and has held that whether due process requires the appointment of counsel in a termination proceeding' is a question of law subject to de novo review. See K.D.G.L.B.P. v. Hinds Cty. Dep’t of Human Servs., 771 So.2d 907, 909 (Miss.2000); J.C.N.F. v. Stone Cty. Dep’t of Human Servs., 996 So.2d 762, 769 (Miss.2008).
¶ 16. ‘ At the outset of our analysis, we must note that the chancellor in this case erred in not making an on-the-record determination' under Lassiter on whether John was entitled to court-appointed counsel before allowing him to proceed pro se. See Lassiter, 452 U.S. at 32, 101 S.Ct. 2153. However, the failure to do so was harmless error, as it is clear from the record that John was given a fair and adequate hearing, and the presence of an attorney would not have made a difference. Turning to the factors emphasized by the Lassiter Court and adopted by this Court in K.D.G.L.B.P., this case did not involve any allegations of abuse or neglect which could have resulted in additional criminal charges against John. On the contrary, the evidence focused on John’s inability to maintain a relationship with his children while serving a life sentence. Thus, the assistance of counsel was not necessary to assist John in protecting his . right against self-incrimination. In addition, no expert testimony was offered at trial, nor did this case involve “specially troublesome points of law.” Lassiter, 452 U.S. at 32, 101 S.Ct. 2153. A GAL was appointed, but her testimony was relatively uncomplicated, and John was given the opportunity to question her about her report. Don and Carolyn McRee were the only other witnesses to testify, and John was allowed to cross-examine them both thoroughly.
¶ 17. Finally, as will be explained more fully in Issue II below, the chancellor’s decision to terminate John’s parental rights was supported by substantial evidence, and the presence of an attorney would not have changed the result of this *1161 case. An illustrative example of a situation in which the presence of counsel would have made an outcome-determinative difference can be found in the Court of Appeals’ recent decision in Pritchett v. Pritchett, 161 So.3d 1106 (Miss.Ct.App.2015). In Pritchett, an incarcerated father’s ex-wife filed a petition to terminate his parental rights to the couple’s two children. Id. at 1108. The father sent the chancellor several letters requesting the appointment of an attorney and transportation to the termination hearing, but the chancellor never responded to these requests. Id. at 1108-09. The hearing was conducted in the father’s absence, and the chancellor terminated the father’s parental rights pursuant to Section 93-15-103, despite the fact that the plaintiff had failed to present sufficient evidence that the requirements of that statute had been met. Id. at 1114. The Court of Appeals found that these “serious due-process concerns” could have been remedied by an attorney and therefore could not say that the presence of counsel would not have made an outcome-determinative difference. Id. at 1111-12.
¶ 18. Here, no such due-process concerns exist. John received adequate notice of the pending adoption proceeding and was present and actively involved at all stages of the proceedings. See J.C.N.F., 996 So.2d at 772 (finding that the chancellor did not err in failing to appoint counsel for a mother who had declined to request legal assistance after receiving adequate notice of a termination hearing and actively participated in the proceedings). At trial, John was able to cross-examine the McRees and the GAL and was able to testify on his own behalf. In addition, the chancellor assisted John in his examination of the witnesses and prevented the McRees from presenting irrelevant evidence. The assistance of counsel cannot change the fact that John was convicted of murdering his wife’s father in front of his children, was sentenced to life imprisonment, and has not had a relationship with A.B. and C.B. for almost a decade. Thus, while the chancellor erred in failing to make a Lassiter ruling on the record, we find such error to be harmless beyond a reasonable doubt in light of the substantial credible evidence supporting the adoption. See Miss. R. Civ. P. 61.
¶ 19. Presiding Justice Dickinson urges this Court to interpret the Mississippi Constitution to require the appointment of counsel in proceedings to terminate parental rights. We do not believe that the provisions cited by the dissent require such a holding. • While state courts may construe their constitutions in such a way as to offer broader protections than those found in the federal constitution, we must “begin with the presumption that similar sections of the United States Constitution and Mississippi Constitution ought to be construed similarly.” McCrory v. State, 342 So.2d 897, 900 (Miss.1977). Article 3, Section 14, of the Mississippi Constitution, which provides that “[n]o person shall be deprived of life, liberty, or property except by due process of law,” is essentially identical to the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Compare Miss. Const, art. 3, § 14 (1890) with U.S. Const, amend. XIV, § 1. And as previously explained, the United States Supreme Court has held that the Due Process Clause of the Fourteenth Amendment does not grant an absolute right to appointed counsel in termination cases. Lassiter, 452 U.S. at 31-32, 101 S.Ct. 2153. Similarly, this Court has never interpreted Article 3, Section 14 of the Mississippi Constitution to provide an absolute right to counsel in a case in which a litigant’s physical liberty is not at stake. See, e.g., Goodin v. Miss. Dep’t of Human *1162 Servs., 772 So.2d 1051, 1055 (Miss.2000) (citing DeMyers v. DeMyers, 742 So.2d 1157, 1162 (Miss.1999)) (“[T]his Court has held, that the rights to appointed counsel and to effective assistance of counsel do not apply in civil proceedings.”). The due process rights of parents in termination cases already are protected under Mississippi law. As the dissent points out, a parent cannot be deprived of the custody of his or her child without notice and an opportunity to be heard. See Sinquefield v. Valentine, 159 Miss. 144, 132 So. 81, 83 (Miss.1931); see also Miss.Code Ann. § 93-15-105 (Rev.2013). Moreover, trial courts have the authority to appoint counsel for indigent parents in appropriate cases. K.D.G.L.B.P., 771 So.2d at 909. But the due process provision of our constitution does not require the additional step of appointment of counsel in all termination-cases.
¶ 20. The dissent also relies on Article 3, Section 24 of the Mississippi Constitution. While this Court has had rare occasion to interpret this ¡provision, we generally have held that it provides an individual “the right to represent himself or herself in any court in any civil cause.” Saxon v. Harvey, 223 So.2d 620, 623 (Miss.1969). But we have rejected the argument that this provision provides an absolute right to counsel in parole revocation hearings. Miss. State Prob. and Parole Bd. v. Howell, 330 So.2d 565, 566 (Miss.1976). The Howell Court did recognize that there may be cases in which due process may require the appointment of counsel for indigent parolees in revocation cases. See id. Likewise, this Court has provided a framework for the appointment of counsel for indigent parents in appropriate termination cases. K.D.G.L.B.P., 771 So.2d at 909. But again, our Constitution ,does not mandate appointment of counsel in all such cases.
¶21. We recognize that at least one state court has interpreted its constitution to require the appointment of counsel for indigent parents in termination cases .after Lassiter was decided. In re T.M., 131 Hawai’i 419, 319 P.3d 338, 354 (2014).[6] However, the overwhelming majority of states that have created a right to counsel in termination proceedings have done so through legislative action, not judicial rulings. See,, e.g. Ala.Code .§ 12-15-305(b); Ark.Code Ann. § 9-27-316(h)(1)(D); Cal. Fam.Code § 7862; Conn. Gen.Stat. Ann. § 45a-717(b); D.C.Code Ann. § 16-2304(b)(l); Fla. Stat. Ann. § 39.807(l)(a); Ga.Code Ann. § 15-11-262(a); Idaho Code Ann. § 16-2009; Ind.Code Ann. § 31-32-2-5; Iowa Code Ann. § 232.113(1); Kan. Stat. Ann. § 38-2205(b)(1); Ky.Rev.Stat. Ann. § 625.080; Md.Code Ann., Cts. and Jud. Proc. § 3-813(b); Minn.Stat. Ann. § 260C.163(3)(b); Mo. Ann. Stat, § 211.462(2); Mont.Code Ann. § 41-3-425(2)(a); Neb.Rev.Stat. Ann. § 43-279.01(l.)(b); N.M. Stat. Ann. § 32A-5-16(E); ■ N.C. Gen. Stats. Ann. § 7B-1109(b); Ohio Rev.Code Ann. § 2151.352; Or.Rev.Stat. §- 419B.518; 23 Penn. Stat. arid Con. Stat. Ann. § 2313(a)(1); S.C.Code-Ann, § 63-7~2560(A); S.D. Codified Laws § 26-7A-31; Tex. Fam.Code Ann. § 107.013; Utah Code Ann. § 78-3a-913(l)(c); Va.Code Ann. § 16.1-266(D)(2); Wis. Stat. Ann. § 48.23 And, notably, some states still leave the issue of appointment *1163 of counsel to the discretion of the trial court. See • Nev.Rev.Stat. Ann. § 128.100(2) (“If the parent or parents of the child desire to be represented by counsel, but are indigent, the court may appoint an attorney for them.”) (emphasis added); In re Parental Rights as to N.D.O., (Nev.2005) (“[N]o absolute right to counsel in termination proceedings exists in Nevada”). The Lassiter Court recognized that “a wise public policy ... may require that higher standards be adopted than those minimally tolerable under the Constitution.” Lassiter, 452 U.S. at 34, 101 S.Ct. 2153. But it is outside our authority to decide whether, as a matter of public policy, all indigent parents in Mississippi should be entitled to appointed counsel in termination proceedings. As the majority of other states have done, we find that the Mississippi Legislature is the proper authority to address this' important issue, as any public-policy determinations of the law are vested'exclusively in the legislative branch of government. Kelly v. Miss. Valley Gas Co., 397 So.2d 874, 877 (Miss.1981).
II. Whether the chancellor erred in terminating John’s parental rights..
¶ 22. At the .conclusion of the trial on the adoption petition, the chancellor determined that John’s incarceration likely would prevent him from being able to care for his children for the foreseeable future; The chancellor also recognized that the children needed the stability of a permanent family, and that the McRees had had custody of the children for nine years and were the only parties who had sought permanent custody of them. Accordingly, the chancellor granted the McRees’ adoption petition, thereby terminating John’s parental rights. On appeal, John argues that the chancellor erred in granting the adoption without first finding that a statutory ground for .the termination of parental rights- existed. ■
¶ 23. A final decree of adoption’ serves to terminate all parental rights of the natural parents. Miss.Code Ann. § 93-17-13(2) (Rev.2013). Section 93-17-7 of the Mississippi Code sets forth the chancery court’s authority to determine the rights of parties in contested adoption cases. The statute specifically provides:
No infant shall be adopted to any person if either parent, after having been summoned, shall appear and object thereto before the making of a decree for adoption, unless it shall be made to appear to the court from the evidence touching such matters that the parent so objecting had abandoned or deserted such infant or is mentally, or morally, or otherwise unfit to rear and train it, including, but not limited to, those matters set out in subsection (2) of this section, in either of which cases the adoption may be decreed notwithstanding the objection of such parent, first considering the welfare of the’ child, or children sought to be adopted.
Miss.Code Ann. § 93-17-7(1) (Rev.2013). Section 93-17-7 lists, specific circumstances under which “an adoption may be allowed over the objection of the parent,” but ultimately provides that “[t]he enumeration of conduct or omissions in this subsection (2) in no way limits the court’s power to such-, enumerated conduct or omissions in determining a parent’s abandonment or desertion of the child or unfitness under subsection (1) of this section.” Id. at (2)(f). The statutory grounds for termination of parental rights in suits brought under Section 93-15-103 also are incorporated by reference as circumstances the chancellor may consider in determining whether to grant an adoption over the objection of a natural parent. Id. at (2)(e). See Miss.Code Ann. § 93-15-103 *1164 (Rev.2013), Thus, to determine in a contested adoption case whether the natural parent has either abandoned or deserted the child, or is otherwise unfit to rear and train the child, the chancellor is free to consider, but was not required to find, the statutory grounds enumerated in Sections 93-17-7 and 93-15-103.
¶24. Here, we recognize that the chancellor did not explicitly follow the procedure outlined in Section 93-17-7 in granting the McRees’ adoption petition. Nevertheless, considering the circumstances set forth in Sections 93-17-7 and 93-Í5-103, we find that clear and convincing evidence supports a finding that John is unfit to rear and train , his children, and the chancellor did not err in granting the adoption. See A.B., 13 So.3d at 1267. This Court previously has considered the effect of a parent’s incarceration on the termination of parental rights. Vance, 582 So.2d at 415. In Vance, the defendant was convicted of murder and armed robbery and sentenced to fifty-four years in prison. Id. The defendant’s minor children, who had witnessed her crimes, were placed in the custody of the Lincoln County Department of Public Welfare. Id. The Department subsequently filed a petition under Section 93-15-103 to terminate the defendant’s parental rights. Id. After a hearing, the chancellor found that the Department had proven by clear and convincing evidence that the defendant’s incarceration had caused a substantial erosion of her relationship with her children, one of the statutory grounds for termination under Section 93-15-103. Id. See Miss.Code Ann. § 93-15-103(3)(f) (Rev.2013) (parental rights may be terminated “when there is some other substantial erosion of the relationship between the parent and child which was caused at least in part by the parent’s serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment”). Accordingly, the chancellor entered an order terminating the defendant’s parental rights. Vance, 582 So.2d at 415.
¶ 25. On appeal, the defendant argued that the chancellor had erred in terminating her parental rights based solely on her incarceration. Id. at 418. This Court, relying on persuasive authority from other jurisdictions, found that “[ijmprisonment, and the resulting conditions, can be rightfully considered as a significant factor when determining whether rights may be terminated.” Id. (citations omitted). The Court noted that the defendant’s children had not seen her in five years, and one of the children seemed to have no memory of her. Id. Other evidence before the chancellor “seemed to show indifference at best on the part of the children toward [the defendant.]” Id. at 417. Ultimately, this Court held that the chancellor properly considered the defendant’s incarceration “as one, albeit major, factor in his finding of substantial erosion.” Id. at 418. Accordingly, this Court affirmed the chancellor’s-termination of the defendant’s parental rights. Id.
¶ 26. The facts of the instant case are strikingly similar to those considered by the Gourt in Vance. Like the children in Vance, A.B. and C.B. witnessed their parents’ crimes. Specifically, A.B. and C.B. witnessed their parents murder their biological great-grandparents, with whom they lived. According to Carolyn McRee’s testimony at trial, this experience had a particularly negative impact on C.B. Don McRee testified that witnessing the murders still affects C.B.: “it’s hard for her-to trust anybody, and she still at some points in time, she gets quite [sic] and just goes to herself.” In addition, John continues to exhibit threatening and violent behavior while in prison. Prior to trial in this case, *1165 John wrote a letter to Wanda that included the following threat: “If [the McRees] continue to stop us from séeing [the children] then they will find out exactly ho^v far out this prison I can reach and they won’t like the results.” Referring to his concern that the McRees were allowing Garth. Brewer to visit his children, John retorted, “That’s unacceptable and I will not allow that to happen. I will have them all gutted.like fish.” John has not seen his children since his arrest almost nine years, ago. The evidence presented at trial indicates that John’s contact with the children during this period has been sporadic at best and has been essentially nonexistent for several years. In addition, the children have not exhibited a desire to .maintain a relationship with their father. On the contrary, the GAL testified that the children were excited about the prospect of being adopted by the McRees. The children also expressed their desire not to visit their parents in prison. Based on her interactions with A.B. and C.B., the GAL made the ultimate recommendation that adoption and termination of parental rights were in the children’s best interest.
¶ 27. After reviewing the evidence before the chancellor, we find that the termination of John’s parental rights was supported by substantial credible evidence. As evidenced by his conviction for murder and his threatening behavior during the pendency of this litigation, John’s “past and present conduct, including his convictions would pose a risk of substantial harm to the physical, mental or emotional health” of his children. Miss.Code Ann. § 93 — 17—7(2)(d) (Rev.2013). In addition, the sheer passage of time since A.B. and C.B. last saw their parents, coupled with their desire to be adopted' by the McRees, evinces a “substantial erosion of the relationship between the parent and child which was caused at least in part by the parent’s ... prolonged imprisonment.” Miss.Code Ann. § 93-15-103© (Rev.2013). See also Vance, 582 So.2d at 418. Consideration .of these factors leads us to. the conclusion that John is “mentally, morally, or otherwise unfit to rear and train” A.B. and C.B. Miss.Code Ann. § 93-17t7(1) (Rev.2013),'. Accordingly, we find that the chancellor’s decision to terminate John’s parental rights was supported by substantial credible evidence and was not manifestly wrong.
¶ 28. John also argues that the chancellor erred in determining that adoption would serve the best interests of A.B. and C.B. by ignoring the fact that the McRees have a family history of molestation and violence. John provides no authority supporting his argument here. “[T]he appellant’s failure to cite authority in support of their argument precludes consideration on appeal.” Matter of Guardianship of Snodgrass, 692 So.2d 85, 87 (Miss.1997); Grey v. Grey, 638 So.2d 488, 491 (Miss.1994).
¶ 29. Notwithstanding John’s failure to cite any authority supporting his argument, this issue is without merit. The chancellor was able to consider John’s allegations of sexual abuse and violence in the McRee household. Carolyn McRee testified that her ex-husband Garth had exposed himself in front of one of their daughters, and Carolyn ultimately lost custody of her children as a result of this incident. Don McRee testified that Garth was allowed at their house only under his supervision. John attempted to elicit testimony from Don McRee that his ex-wife also had molested his children, resulting in the termination of her parental rights. The chancellor, who had presided over that termination .ease, prevented John from discussing this incident, finding it to be irrelevant to the issues before the court. Don McRee also testified that he once acciden *1166 tally had shot himself and Carolyn while unloading a gun. ’
¶ 30. On the other hand, the chancellor also heard testimony that A.B. and C.B. had settled in well with the McRees, had formed bonds with the McRees’ children, and were excited by the prospect of being adopted. The ' GAL testified that the McRees were willing and capable parents and ultimately recommended that the adoption would be in the children’s best interest. After considering all of this evidence, the chancellor held that the best interests of A.B. and C.B. would be furthered by granting the adoption. The chancellor’s decision here was supported by substantial credible evidence and was not manifestly wrong.
III. Whether the chancellor erred in failing to address John’s pretrial motions, and whether the chancellor failed to consider alternatives to the adoption.
¶ 31. On September 27, 2012, John filed a motion asking the chancellor to place A.B. and C.B. in the custody of his parents “for their safety and well-being” until John was released from prison. Alternatively, John asked for his children to be moved to a foster .home. . John asserted that Don McRee previously had shot Carolyn McRee during a fight, and that the McRees had allowed A.B. and C.B. to spend time with Carolyn’s ex-husband Garth Brewer, a known pedophile whose actions had caused Carolyn to lose custody of her own children. John also claimed that the McRees had prevented him from communicating openly with his children.
¶32. On January 25, 2013, John filed another motion requesting visitation of his children under the supervision of his parents. He requested this visitation to take place during his ■ parents’ visits to the South Mississippi Correctional Facility, which occurred twice a month. John also asked the court to prohibit Garth Brewer from having contact with his children.
¶ 33. The chancellor never explicitly addressed either of the above motions. However, at trial, the chancellor noted that John’s parents had not made any attempt to intervene in the case and had not sought custody of the children. The' chancellor acknowledged that only the McRees “have come forward at this time and requested to be allowed to adopt the children. No one else has come before this Court to request that they be allowed to'adopt the children or to visit with the children.” The chancellor did not specifically state in his order granting the adoption that he had considered other alternatives. On appeal, John argues that the Chancellor failed to consider granting custody to his parents as an alternative to granting the McRees’ adoption petition. He also argues that the chancellor erred in failing to grant his request for visitation with his children.
¶ 34. John relies solely on Section 93-15-103(4) of the Mississippi Code in support of his argument that the chancellor erred in failing to grant custody of A.B. and C.B. to his parents. Section 93-15-103(4) instructs the chancery court to consider alternative arrangements, before terminating parental rights. Specifically, the statute provides:
Legal custody and guardianship by persons other than the parent as well as other permanent alternatives which end the supervision by the Department of Human Services should be considered as alternatives to the termination of parental rights, and these alternatives should be selected when, in the best interest of the child, parental contacts are desirable and it is possible to secure such-placement without termination of parental rights.
Miss.Code Ann. § 93-15-103(4) (Rev.2013). John appears to argue that the chancellor *1167 erred by failing to state explicitly his reasons for rejecting alternatives to the adoption.
¶35. This Court considered a similar argument in In re Adoption of Minor Child, 931 So.2d 566, 580 (Miss.2006). In that case, the appellant argued that the chancellor had erred in failing to consider reasonable alternatives to the termination of her parental rights. Id. at 579. This Court recognized that the chancellor’s opinion did not include the “magic” words “other permanent alternatives” or specifically state .that alternatives were considered. Id. at 580. Nevertheless, we held that it was “readily apparent from the record that he did so,” as the only options available to the chancellor were to grant the adoption or return the child to the mother’s custody. Id. Accordingly, we found that the chancellor had complied with the instruction of Section 93-15-103(4). Id.
¶36. The analysis provided in In re Adoption of Minor Child applies equally to the instant case. While John continuously urged the chancellor to award his parents custody of A.B. and C.B., his parents never took any legal action requesting custody of the children. Additionally, it appears that John’s parents had made no effort to visit the children for almost six years. Accordingly, the chancellor correctly concluded that the only options available were (1) granting the adoption, or (2) denying the adoption and keeping the children in the legal custody of the McRees. As explained above, the chancellor’s decision to grant the adoption over John’s objection was supported by substantial credible evidence. This argument is without merit.
¶ 37. John’s argument regarding visitation also is without merit. “A party seeking the modification must show that a prior decree is not working and that a modification is in the best interests of the child.” Christian v. Wheat, 876 So.2d 341, 345 (Miss.2004) (citing Cox v. Moulds, 490 So.2d 866, 869 (Miss.1986)). In Wheat, an incarcerated father filed a petition requesting the chancery* court to allow his child to visit him in prison. Id. at 343. After a hearing, the chancellor issued an order providing for visitation one Saturday per month. Id. at 345. On appeal, this Court reversed the chancellor’s visitation order, finding that the chancellor had failed to determine whether visitation would be in the child’s best interest. Id. at 346. Notably, this Court found that it was “incumbent on [the father] to make some showing that modification to allow the visitation was in the best interest of the child[.]” Id. Because there was no testimony concerning the impact the exposure to the prison environment might have on a minor child, this Court held that the trial court’s order allowing visitation was improper. Id. • The father “supplied no testimony concerning what would be in [the child’s] best interest. There was no showing, that it would be advantageous in any way for [the child] to visit [the father] in prison.” Id. at 345.
¶ 38. Like the father in Wheat, John offered no evidence indicating that the best interest of A.B. and C.B. would be served by visiting John in prison. On the contrary, the chancellor heard testimony that the children did not want to visit their parents. In addition, it does not appear that John took any steps to secure visitation prior to the filing of the adoption petition. In the absence of any evidence that visitation would be in the children’s best interest, we find that the chancellor did not err in failing to grant John’s request for visitation.
IY. Whether the chancellor erred in prohibiting John from calling witnesses at trial.
¶ 39. In two sentences of his brief, John argues that he should have been allowed to *1168 call witnesses at trial. ' However, it does not appear that John attempted to call any witnesses at trial, nor does it appear that John ever attempted to secure any witnesses to testify. In addition, John presents no legal authority in support of his argument. “[T]he appellant’s failure to cite authority in support of their argument precludes consideration on appeal.” Snodgrass, 692 So.2d at 87.
V. Whether the guardian ad litem failed in her duty to fully investigate this matter.
¶ 40. John asserts that the GAL spoke only with his parents and failed to contact any of the additional witnesses he provided. John did not challenge the GAL’s investigation before the chancellor. In addition, John does not offer any evidence to substantiate his allegations, and the GAL’s report does not mention any alleged witness list. Finally, John cites no alleged deficiencies in the conduct of the GAL’s duties and no authority supporting his argument that the GAL failed in her duties as a guardian ad litem. “[T]he appellant’s failure to cite authority in support of their argument precludes consideration on appeal.” Snodgrass, 692 So.2d at 87.
CONCLUSION
¶ 41. For the foregoing reasons, we affirm the judgment of the chancery court granting the McRees’ adoption petition and terminating John’s parental rights.
¶42. AFFIRMED..
RANDOLPH, P.J., LAMAR, COLEMAN, MAXWELL AND BEAM, JJ., CONCUR. DICKINSON, P.J.,
DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND KING, JJ.

. The minor children will be referred to by their initials to protect their privacy.

. John was convicted of Willie Earl’s murder, but the trial court declared a mistrial on the charge for Anita's murder. In a separate trial, Wanda was convicted of both murders. See Blakeney, 29 So.3d at 48 (affirming John’s conviction and sentence); Blakeney v. State, 39 So.3d 1001, 1003 (Miss.Ct.App.2010) (affirming Wanda’s convictions and sentences).

. The evidence concerning John’s contact with his children is conflicting. John alleged that his no-contact order was enforceable for three years, and he did not attempt to contact his children until the order expired. However, John could .contact his children only when his parents were visiting them at the McRees’ house, and Carolyn McRee testified that John’s parents stopped visiting the children about three years after John’s arrest.

. It does not appear that Wanda has appealed the chancellor’s judgment.

. The amicus curiae brief was filed by P. David Bridges of Roberts, Bridges & Boyds-tun, PLLC, and T.L. “Smith” Boykin, III, of Page Kruger & Holland, P.A.

. We also note that, prior, to Lassiter, many state and federal courts had interpreted the Due Process Clause of the Fourteenth Amendment to require the appointment of counsel for indigent parents in state-initiated termination proceedings. See Lassiter, 452 U.S. at 30, 101 S.Ct. 2153 (citations omitted). However, Lassiter "cast real doubt on the validity of these decisions, insofar as they .were premised on federal due process grounds.” Matter of Adoption of K.A.S., 499 N.W.2d 558, 562 (N.D.1993).