# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CP-01209-COA

**CANDRA BETH CLARK**                                                    **APPELLANT**

**v.**

**TIPPAH COUNTY DEPARTMENT OF CHILD**                    **APPELLEES**
**PROTECTION SERVICES AND STATE OF**
**MISSISSIPPI**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/21/2021 |
| TRIAL JUDGE: | HON. ROBERT Q. WHITWELL |
| COURT FROM WHICH APPEALED: | TIPPAH COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: JENNIFER LOUISE MORGAN |
| | CANDRA BETH CLARK (PRO SE) |
| ATTORNEY FOR APPELLEES: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: PATRICIA JOYCE RICHARDSON |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED - 02/07/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., SMITH AND EMFINGER, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     Candra Clark appeals from the Tippah County Chancery Court's judgment terminating her parental rights to her minor child, L.A.R.[1] Clark asserts that she was not properly served for the youth court adjudication and disposition hearings, and as a result, the orders entered after those hearings are void due to lack of personal jurisdiction. Clark further submits that because the chancellor relied upon the void adjudication order when terminating her parental rights, the resulting judgment terminating her parental rights is also void.

---

[1] Initials are used to protect the identity of the minor child.

¶2.    After our review of the record, we find no error.  We therefore affirm the chancellor's judgment.

## FACTS

¶3.    Clark and W.R. had a son, L.A.R., who was born in February 2016.  On December 1, 2018, the Tippah County Department of Child Protection Services (CPS) received a call from law enforcement regarding a domestic violence disturbance at Clark and W.R.'s home in Tippah County, Mississippi.  When CPS arrived at the home, W.R. was intoxicated, and Clark was arrested and charged with domestic violence.  As a result, L.A.R. was placed in emergency custody.  Two days later, L.A.R. was placed with his paternal aunt in Harrison County, Mississippi.

¶4.    After L.A.R. was placed in CPS custody, CPS developed a service plan for the reunification of Clark, W.R., and L.A.R.  The service plan set forth tasks to be completed by Clark and W.R. prior to reunification.

¶5.    After the parties agreed on the service plan, Clark's relationship with CPS quickly deteriorated.  The record reflects that Clark called law enforcement on three separate occasions claiming that CPS had kidnapped L.A.R.  CPS also received a report that Clark had threatened to kill the Tippah County CPS supervisor, L.A.R.'s social worker, and the youth court judge.  The record shows that Clark was unwilling to work with CPS and she ultimately failed to complete her service plan.

¶6.    On January 24, 2019, the Tippah County Youth Court held an adjudication hearing

and a disposition hearing. Clark did not attend the hearings. After the adjudication hearing, the youth court entered an order adjudicating L.A.R. to be neglected. As a result of Clark's non-compliance with the service plan and her threatening behavior, the order stated that Clark "is hereby restrained and enjoined from going to the CPS office or contacting the CPS workers. Due to aggr[a]vating circumstances, CPS no longer has to work with [Clark], including visits, until she appears before the [c]ourt to address her compliance with the agency." After the disposition hearing, the youth court entered an order placing L.A.R. in CPS custody. That order also stated that CPS "is not required to work with [Clark] due to her non-compliance and mental health issues which are untreated." The youth court later entered a corrected disposition order that contained a no-contact order prohibiting Clark from contacting L.A.R. or his foster parents.

¶7. Weeks later, CPS was notified that Clark had made threats against CPS staff via Facebook; specifically, Clark was threatening to "shoot up" the CPS office and drive her car through the youth court building. As a result, CPS contacted the Attorney General's (AG) office to file a restraining order against Clark on CPS's behalf. The AG's office filed a motion for a restraining order, seeking to prevent Clark from approaching or contacting CPS members or the CPS office building.

¶8. After a hearing, the chancery court entered a permanent injunction against Clark to prevent her from contacting CPS. The record reflects that during the hearing, Clark grew angry, cursed at the judge, and then stormed out of the hearing. The chancellor held Clark

3

in contempt and ordered her to serve thirty days in jail. After the chancellor issued the contempt order, law enforcement attempted to detain Clark. The record shows that Clark resisted efforts to take her into custody by ramming her vehicle into a police car. Law enforcement ultimately had to tase Clark in order to place her under arrest. As a result of these actions, Clark was charged with assaulting a police officer while resisting arrest.

¶9. Despite the restraining order, Clark continued to make violent threats against CPS and the youth court judge. CPS received two "Duty to Warn" notices from Lifecore Health Group (Lifecore) following its psychiatric evaluation of Clark. A staff member from Lifecore sent a letter to CPS detailing Clark's threats and stated that Clark "expressed that she had been having thoughts of murdering [L.A.R.'s social worker, the CPS supervisor, and the youth court judge]." Clark also "expressed that she had been having thoughts of blowing up an elementary school" close to the CPS office and "dismembering children." The letter stated that as a result of these threats, Clark was transported to a hospital.

¶10. On June 13, 2019, the youth court held a permanency hearing and changed L.A.R.'s permanency plan from reunification to adoption. On December 2, 2019, CPS filed a petition in chancery court seeking to terminate Clark and W.R.'s parental rights to L.A.R.[2] In June

---

[2] *See* Miss. Code Ann. § 93-15-105(1) (Rev. 2018) ("The chancery court has original exclusive jurisdiction over all termination of parental rights proceedings except when a county court sitting as a youth court has acquired jurisdiction of a child in an abuse or neglect proceeding, then the county court shall have original exclusive jurisdiction to hear a petition for termination of parental rights against a parent of that child pursuant to the procedures of this chapter.").

2020, W.R. signed a written release voluntarily terminating his parental rights.

¶11. The record reflects that at some point after August 2019, Clark was incarcerated and not released until November 2020. From January 2021 through July 2021, Clark continued her pattern of threats and violent outbursts. Clark sent disturbing and threatening messages via Facebook to L.A.R.'s social worker and the CPS supervisor; she contacted the Harrison County CPS office (the county where L.A.R.'s foster parents lived), and threatened to kill the CPS workers; she went to the Harrison County youth court building and broke several windows in the building and in the parking lot after being told that the judge could not see her that day; and, while inside of a bank, Clark accused the bank of stealing her money, and she proceeded to throw bank property and assault an officer.

¶12. On September 14, 2021, the chancery court held a hearing on CPS's petition to terminate Clark's parental rights. Clark was incarcerated at the Harrison County jail at the time, but she was transported to the chancery court for the proceedings. At the hearing, the chancellor heard testimony from L.A.R.'s social worker, the Tippah County CPS supervisor, and Clark.

¶13. Testimony revealed that at the time of trial, Clark was incarcerated with no income, housing, or opportunities lined up upon her release. The CPS supervisor testified that in her professional opinion, Clark was mentally, morally, and otherwise unfit to parent L.A.R. The supervisor also opined that Clark was unwilling to provide reasonably necessary food, clothing, shelter, or medical care for L.A.R. The supervisor stated that she based her opinion

5

on Clark's actions while she was not incarcerated, explaining that even when Clark was not in jail, she made no progress on her service plan and made no attempts to rectify the issues that brought L.A.R. into CPS custody in the first place. The supervisor also testified that Clark had been unable to provide food, clothing, shelter, or medical care for herself.

¶14. L.A.R.'s social worker testified that L.A.R. was thriving and happy in his current placement with his aunt and uncle. The social worker stated that L.A.R. no longer needed therapy and that he gets to spend time with extended family outside of his aunt and uncle.

¶15. Clark testified that she had a great relationship with L.A.R. before his placement in CPS custody. Clark asserted that immediately after L.A.R. was placed in custody, she began having issues with CPS because she felt like CPS did not listen to her input. Regarding the threats she made to CPS, Clark testified that she was angry over everything that happened. Clark denied making any threats, and she explained that she was just venting about how she felt. When asked if she had taken any steps to get her life back on track since L.A.R. was placed in CPS custody, Clark testified that after she was released from jail for contempt of court, she made W.R. leave their home. She also stated that she took ten hours of anger management classes online, but she was unable to provide any proof of this attendance at the hearing. Clark further testified that she received some mental health treatment from Lifecore. She explained that she refused to sign a consent for CPS to obtain her mental health records, though, because "CPS was lying and manipulating and [she] felt like they were just trying to fish to find something against [her]."

6

¶16. The chancellor reviewed Clark's service plan with CPS, the adjudication order, the disposition order, the permanency order, and the guardian ad litem's report. The chancellor also reviewed the Facebook messages, the letter from Lifecore, and the order of criminal contempt, all of which detailed Clark's threatening behavior.

¶17. The guardian ad litem's report reflected that Clark's parental rights should be terminated based on the finding that Clark was mentally, morally, and otherwise unfit to parent the child in accordance with Mississippi Code Annotated section 93-15-119 (Rev. 2018), and that Clark is unwilling to provide reasonably necessary food, clothing, shelter, or medical care for the child in accordance with Mississippi Code Annotated section 93-15-121(d) (Rev. 2018). The guardian ad litem recommended that Clark's parental rights be terminated, and she found that termination would be in L.A.R.'s best interests.

¶18. On September 21, 2021, the chancellor entered an order granting CPS's petition to terminate Clark's parental rights. It is from this judgment that Clark appeals.

## STANDARD OF REVIEW

¶19. When reviewing a judgment terminating parental rights, "[t]he chancellor's findings of fact are viewed under the manifest error/substantial credible evidence test." *Blakeney v. McRee*, 188 So. 3d 1154, 1159 (¶13) (Miss. 2016). "[W]e will not disturb the [chancellor's] findings of fact where there is credible proof from which a rational trier of fact may have found grounds for termination by clear and convincing evidence." *Id.* (internal quotation marks omitted).

7

## DISCUSSION

### I.      Adjudication Order and Disposition Order

¶20.    On appeal, Clark asserts the youth court held the adjudication hearing and disposition hearing without providing Clark proper notice, thereby violating her due process rights. Clark claims that although she received the summons notifying her of the hearings, the summons was defective because it listed the wrong location for the hearings. As a result, Clark argues that the adjudication order and disposition order entered by the youth court are void due to defective service of process, and all subsequent judgments based on these orders, including the judgment terminating her parental rights, are also void.

¶21.    Mississippi Code Annotated section 43-21-501(1) (Rev. 2015) provides that "[w]hen a petition has been filed and the date of hearing has been set by the youth court, the judge or his designee shall order the clerk of the youth court to issue a summons" to the parent of the child at issue "to appear personally at such hearing." *See also* U.R.YC.P. 22(a)(1) (adjudication hearings). Mississippi Code Annotated section 43-21-503 (Rev. 2015) requires the summons to set forth the location of the hearing.

¶22.    Clark admits that she received service of process regarding the adjudication and disposition hearings on January 24, 2019; however, she claims that the summons instructed her to appear at Tippah County courthouse for the hearings. The record reflects that the adjudication and disposition hearings were held at the Benton County courthouse. At the termination-of-parental-rights hearing, Clark testified that when she arrived at the Tippah

8

County courthouse for the adjudication and disposition hearings, she discovered that the summons contained a mistake, and the hearings were actually at the Benton County courthouse. Clark explained that she had used all her money to purchase gas to get to Tippah County for the hearings. Clark testified that she was ultimately unable to attend the hearings because she did not have enough gas to get from Tippah County to Benton County and then back home.

¶23. The record before us does not contain a copy of the summons at issue or a copy of the youth court docket. The transcript from the termination-of-parental-rights hearing reflects that Clark's counsel showed the CPS supervisor a document that "purports to be a summons issued for that adjudication [hearing]." The CPS supervisor testified that she read the document as instructing Clark to appear at the Tippah County courthouse. The CPS supervisor confirmed that the adjudication hearing was actually held at the Benton County courthouse. Our review of the record reflects that this document was never authenticated or identified by the CPS supervisor. The document was never entered into evidence.

¶24. Although Clark testified that her summons listed the wrong location for the adjudication and disposition hearings, she failed to make any objection to the validity of the youth court adjudication and disposition orders or raise any jurisdictional issues at the termination-of-parental-rights hearing. She also failed to object to these orders being admitted into evidence. The only judgment subject to the current appeal is the judgment terminating Clark's parental rights. *See M.A.S. v. Lamar Cnty. Dep't of Child Prot. Servs.*,

9

No. 2020-CA-00070-COA, 2021 WL 4271909, at *9-10 (¶35) (Miss. Ct. App. Sept. 21, 2021), *cert. denied*, 334 So. 3d 1161 (Miss. 2022). Because Clark failed to challenge the validity of these orders at the termination-of-parental-rights hearing or object to these orders being entered into evidence, this issue was not preserved and is waived on appeal. *In re B.A.H.*, 225 So. 3d 1220, 1239 (¶62) (Miss. Ct. App. 2016).

¶25. Waiver aside, the record also reflects that Clark has not appealed the youth court's adjudication and disposition orders, nor has she "challenge[d] the validity of the order based on defective process by moving to set it aside as void for lack of personal jurisdiction under Mississippi Rule of Civil Procedure 60(b)(4)." *J.P. v. L.S.*, 290 So. 3d 345, 371 (¶84) (Miss. Ct. App. 2019). Clark also failed to raise any jurisdictional challenges with respect to the youth court's adjudication and disposition orders, either in youth court or before the chancery court. *Id*. "Accordingly, [Clark] has waived [her] right to challenge the validity of the adjudicatory order for lack of proper process, or the chancery court's purported reliance on that order, because [s]he has since appeared generally in these proceedings." *Id*. at (¶85). Accordingly, we find that Clark's due process rights were not violated by the chancellor's admitting the adjudication and disposition orders into evidence at the termination hearing.

## II. Termination of Parental Rights

¶26. As stated, the judgment terminating Clark's parental rights is the only judgment subject to the current appeal. In that judgment, the chancellor determined that the termination of Clark's parental rights was in L.A.R.'s best interests. In making this

10

determination, the chancellor found "no doubt that there exists clear and convincing proof" that Clark abandoned L.A.R. and that she exhibited "past and ongoing behavior that was and would be detrimental to [L.A.R.'s] health and welfare." In support of these findings, the chancellor summarized Clark's concerning and threatening behavior.

¶27. In her appellate brief, Clark fails to raise any issues or assignments of error attacking the judgment terminating her parental rights. "[W]e decline to address an issue that has not been briefed on appeal." *Rosenfelt v. Miss. Dev. Auth.*, 262 So. 3d 511, 519 (¶27) (Miss. 2018). This Court has held that "we will not act as an advocate for one party to an appeal. The appellant must affirmatively demonstrate error in the court below, and failure to do so waives an issue on appeal." *Jefferson v. State*, 138 So. 3d 263, 265 (¶9) (Miss. Ct. App. 2014); *accord Ridgway Lane & Assocs. Inc. v. Watson*, 189 So. 3d 626, 627 (¶1) (Miss. 2016).

¶28. Finding no error, we affirm the chancellor's judgment.

¶29. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. GREENLEE, J., NOT PARTICIPATING.**