# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-01618-COA

R.B. AND A.C.P.                                                                          APPELLANTS

v.

WINSTON COUNTY DEPARTMENT OF CHILD                              APPELLEE
PROTECTION SERVICES

| | |
|---|---|
| DATE OF JUDGMENT: | 10/25/2017 |
| TRIAL JUDGE: | HON. JOSEPH KILGORE |
| COURT FROM WHICH APPEALED: | WINSTON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | KELLY GUNTER WILLIAMS |
| | ANDRE DE GRUY |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: THOMAS S. COLEMAN |
| | JOYCE HILL WILLIAMS |
| | MARION EARL SCALES |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 12/17/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE J. WILSON, P.J., TINDELL AND LAWRENCE, JJ.**

**TINDELL, J., FOR THE COURT:**

¶1.     Rachel and Alex appeal the judgment of the Winston County Chancery Court terminating their parental rights to their two children, Tina and Aaron.[1]  On appeal, Rachel and Alex argue (1) there was insufficient evidence to show that the Winston County regional office of the Mississippi Department of Child Protection Services (CPS) used reasonable efforts over a reasonable amount of time to diligently assist them in complying with their

---

        [1] To protect the identities of the minor children involved in this case, we use fictitious names for both the Appellants and the minor children.

service plans; and (2) the chancellor erroneously found that clear and convincing evidence supported the termination-of-parental-rights (TPR) petition. Because the record contains sufficient credible evidence to support the chancellor's judgment, we affirm the termination of both Rachel's and Alex's parental rights.

**FACTS**

¶2. Tina was born in 2008, and Aaron was born in 2012. On March 9, 2014, the children entered CPS custody after CPS received information that Rachel and the children were homeless and sleeping in a car in a parking lot. Rachel, Alex, and the children had been staying with Alex's mother. After a disagreement, Alex's mother asked the family to leave her house, and the family had nowhere else to go. On March 25, 2014, the Winston County Youth Court entered an order finding that the children were neglected.

¶3. In May 2014, about two months after the children entered CPS custody, Rachel moved to Oklahoma. The record reflects that she did not physically see the children again for almost three years. Around June 2014, Alex was incarcerated for a parole violation. Testimony reflected that he did not have any extended interaction with the children again for almost three years. In January 2015, both Rachel and Alex entered into service plans with CPS. Rachel's service plan required her to maintain housing and employment in Oklahoma and to maintain phone visits with the children and their social worker. For Alex, who was still incarcerated, the service plan required that he contact the children by phone and letters and participate in services and classes provided by the prison system.

¶4. On February 24, 2015, the youth court entered permanency orders that identified each

2

child's permanency plan as reunification with Rachel and Alex. On August 25, 2015, however, the youth court entered orders that changed each child's permanency plan to adoption. The Winston County office of the Mississippi Department of Human Services (DHS) filed a TPR petition in chancery court on February 3, 2016. The youth court held a permanency hearing on February 23, 2016. During that hearing, the youth court acknowledged that adoption was now the designated permanency plan for both children. DHS filed an amended TPR petition in chancery court on August 30, 2016, to comply with changes to the amended TPR statute. Rachel and Alex each answered the petition and denied that the chancellor should grant it.

¶5. At some point in 2016, Alex was released from prison. In September 2016, Rachel moved back to Winston County from Oklahoma. Upon returning to Mississippi, Rachel initially lived with Alex and his father before moving out because Alex was drinking and threatening her. When the TPR hearing began on May 12, 2017, Rachel was living with Alex's mother, who had previously kicked the family out of her house in 2014. Just prior to the second day of the TPR hearing on July 19, 2017, Rachel secured housing of her own.

¶6. The guardian ad litem (GAL) appointed by the chancellor found that the relationship between the biological parents and the children had substantially eroded due in part to "both parents' prolonged and unreasonable absence and unreasonable failure to visit . . . ." The GAL further determined that the parents had failed to exercise reasonable visitation or communication with the children while the children had been in CPS custody. The GAL concluded that TPR was in the children's best interest.

3

¶7. Following two days of evidence and testimony, the chancellor issued his bench ruling on August 29, 2017. He then entered his final judgment on October 25, 2017. The chancellor ordered the termination of Rachel's and Alex's parental rights to both children. In so doing, the chancellor recognized the youth court's prior determination that the children had been neglected and in CPS custody for at least six months. The chancellor also noted the youth court's findings that CPS had developed a service plan for the children's reunification with their parents and "ha[d] made reasonable efforts over a reasonable period of time to diligently assist [Rachel and Alex] in complying with the terms and conditions of the service plan but that [the parents] ha[d] failed to substantially comply with the terms and conditions of the service plan . . . ." The chancellor concluded that clear and convincing evidence showed TPR was in the children's best interest because reunification was not desirable for obtaining a satisfactory permanency outcome. Citing Mississippi Code Annotated section 93-15-121(d)-(f) (Supp. 2016), the chancellor found that the following grounds supported TPR: (1) Rachel and Alex had demonstrated an unwillingness "to provide reasonably necessary food, clothing, shelter, or medical care for the child[ren]"; (2) they "ha[d] failed to exercise reasonable visitation or communication with the child[ren]"; and (3) their "abusive or neglectful conduct ha[d] caused, at least in part, an extreme and deep-seated antipathy by the child[ren] toward the parent[s], or some other substantial erosion" of the parent-child relationship.

¶8. Aggrieved by the termination of their parental rights, Rachel and Alex appeal.

**STANDARD OF REVIEW**

4

¶9. We review a chancellor's findings of fact regarding TPR "under the manifest error/substantial credible evidence test." *Blakeney v. McRee*, 188 So. 3d 1154, 1159 (¶13) (Miss. 2016). Thus, we will not reverse when "credible proof exists to support the chancellor's finding[s] of fact by clear and convincing evidence." *W.A.S. v. A.L.G.*, 949 So. 2d 31, 34 (¶7) (Miss. 2007). We review de novo questions of law, such as statutory interpretation. *E.K. v. Miss. Dep't of Child Prot. Servs.*, 249 So. 3d 377, 381 (¶16) (Miss. 2018).

## DISCUSSION

### I. Reasonable-Efforts Requirement

¶10. Rachel and Alex argue that DHS presented insufficient evidence to show that CPS used reasonable efforts over a reasonable period to diligently assist them in complying with their service plans. According to Rachel and Alex, the evidence demonstrated that they substantially complied with their service plans despite CPS's failure to use reasonable efforts to diligently assist them. Rachel and Alex further contend the chancellor misinterpreted Mississippi Code Annotated section 93-15-115 (Supp. 2016) by stating that only the youth court could determine whether the reasonable-efforts requirement had been satisfied.

¶11. Section 93-15-115 provides:

> **When reasonable efforts for reunification are required** for a child who is in the custody of, or under the supervision of, the Department of Child Protection Services pursuant to youth court proceedings, **the court hearing a petition under this chapter may terminate the parental rights of a parent if, after conducting an evidentiary hearing, the court finds by clear and convincing evidence that**:
>
> > (a) The child has been adjudicated abused or neglected;

5

(b)    The child has been in the custody and care of, or under the supervision of, the Department of Child Protection Services for at least six (6) months, and, in that time period, the Department of Child Protection Services has developed a service plan for the reunification of the parent and the child;

(c)    **A permanency hearing, or a permanency[-]review hearing, has been conducted pursuant to the Uniform Rules of Youth Court Practice and the court has found that the Department of Child Protection Services, or a licensed child[-]caring agency under its supervision, has made reasonable efforts over a reasonable period to diligently assist the parent in complying with the service plan but the parent has failed to substantially comply with the terms and conditions of the plan and that reunification with the abusive or neglectful parent is not in the best interests of the child**; and

(d)    Termination of the parent's parental rights is appropriate because reunification between the parent and child is not desirable toward obtaining a satisfactory permanency outcome based on one or more of the grounds set out in Section 93-15-119 or 93-15-121.

(Emphasis added).

¶12.    In his bench opinion, the chancellor discussed each of section 93-15-115's requirements that must be proved by clear and convincing evidence before TPR is granted. In considering the reasonable-efforts requirement, the chancellor found:

[A] permanency hearing, or permanency[-]review hearing, has been conducted pursuant to the Uniform Rules of Youth Court Practice and that **that** court has found that CPS has made reasonable efforts over a reasonable period to diligently assist the parents in complying with the service plan but the parents have failed to substantially comply with the terms and conditions of the plan . . . . The Winston County Youth Court did so . . . .

(Emphasis added).

6

¶13.   Upon review, we find that the plain language of section 93-15-115(c) requires "the court hearing a [TPR] petition[,]" which in this case was the chancery court, to find (1) that **the youth court** had previously held a permanency hearing or permanency-review hearing under the Uniform Rules of Youth Court Practice and (2) that **the youth court** had previously "found" that CPS had made "reasonable efforts" to assist the parent in complying with his or her service plan, that the parents failed to substantially comply, and that reunification was not in the child's best interest.  Miss. Code Ann. § 93-15-115(c).  We therefore conclude that the chancellor in this case correctly understood section 93-15-115(c) to require him to find that **the youth court** had held such a hearing and that **the youth court** had made the necessary findings.

¶14.   In his bench ruling, the chancellor further stated:

> Although this court may not have come to the same conclusion as the youth court in August of 2015—that CPS had made reasonable efforts to diligently assist the parents in complying with the service plan and that the parents had failed to substantially comply with the terms and conditions—the statute does not give this court the power to make that determination.  The youth court has exclusive power to make that determination.
>
> Section 93-15-115, [s]ubsection (c), directs the chancery court to make a finding that a permanency hearing or a permanency[-]review hearing has been conducted pursuant to the Uniform Rules of Youth Court Practice, and that court has made such a finding.  Nothing allows the chancery court to go behind the findings of the referee unless, of course, the order of the referee is appealed.
>
> There is evidence in the record that the Winston County Youth Court did make that finding.  That finding was not challenged, and this court must determine if [TPR] is appropriate based on one or more of the following grounds as set forth in the statute.

¶15.   In their appellate brief, Rachel and Alex assert that the chancellor "expressed

considerable doubt as to whether the reasonable[-]efforts requirement was satisfied." As discussed, however, section 93-15-115(c) requires "the court hearing a [TPR] petition" to confirm that the youth court previously "found" that CPS made "reasonable efforts" and that the other prerequisites for TPR have been met. The statute does **not** require the TPR court to reassess the youth court's prior factual determinations. Here, the youth court, a court of competent jurisdiction, determined that sufficient credible evidence satisfied the reasonable-efforts requirement, and the chancellor correctly recognized that the findings referenced in section 93-15-115(c) are findings that the youth court makes when it determines whether CPS should file a TPR petition. *See* U.R.Y.C.P. 29; *see also* Miss. Code Ann. § 43-21-105(gg) (Rev. 2015) (defining "reasonable efforts"). The chancellor therefore properly noted the youth court's previous finding that CPS had used reasonable efforts before he proceeded to determine whether clear and convincing evidence supported a statutory ground for TPR. We therefore find that this assignment of error lacks merit.

## II. Termination of Rachel's and Alex's Parental Rights

¶16. Rachel and Alex also contend that insufficient evidence supported the termination of their parental rights. The chancellor concluded that clear and convincing evidence supported the termination of Rachel's and Alex's parental rights on three statutory grounds: (1) their unwillingness to provide the children with "reasonably necessary food, clothing, shelter, or medical care"; (2) their failure "to exercise reasonable visitation or communication" with the children; and (3) their neglectful conduct caused, at least in part, "an extreme and deep-seated antipathy" by the children toward them or "some other substantial erosion" of

8

the parent-child relationship.  Miss. Code Ann. § 93-15-121(d)-(f).

¶17.    As this Court has previously explained:

> While the rights of a parent are fundamental, they are not absolute.  By statute, a parent may lose his parental rights if he fails to make any contact with his child for more than a year or causes his relationship with his child to substantially erode, at least in part, through his own serious neglect, prolonged and unreasonable absence, or unreasonable failure to visit or communicate.

*Barnes v. McGee*, 178 So. 3d 801, 803 (¶1) (Miss. Ct. App. 2013).  Only one statutory ground is necessary to justify TPR.  *Id.* at 805 (¶13).  In the present case, credible proof supported the chancellor's findings that clear and convincing evidence established three grounds for the termination of Rachel's and Alex's parental rights.  We briefly address each of these three grounds.

**A.     Unwillingness to Provide Reasonably Necessary Food, Clothing, Shelter, or Medical Care**

¶18.    The children initially entered CPS custody on March 9, 2014, because they lacked appropriate shelter and were living in Rachel's car.  By the time of the termination hearing in 2017, however, the testimony reflected that Tina and Aaron were now "thriving in the stable environment where they ha[d] been" for over three years.  The chancellor also found that, during the three-year time period at issue, Rachel and Alex had failed to demonstrate a willingness to provide reasonably necessary food, clothing, shelter, and medical care for the children.

¶19.    Both the children's social worker, Florarine Nicholson, and Nicholson's supervisor, Joann Clark, testified at the TPR hearing.  Nicholson became the children's social worker around June 2015, and Clark supervised the case the entire time the children were in CPS

9

custody. Nicholson testified that during the two years she had been involved in the case neither parent had provided necessary food, clothing, medical care, or shelter for the children. The record contains no evidence that, either during or after his release from prison, Alex sought to provide reasonably necessary contributions for the children's well being. Following his release from prison in 2016, Alex moved in with his father, who CPS found unsuitable as a relative placement for the children due to his prior criminal history. At the TPR hearing, Nicholson testified that, to the best of her knowledge, Alex continued to reside with his father and had failed to secure employment. In addition, the GAL testified that, since Alex's release from prison, he had been arrested twice in 2017 and charged with public drunkenness.

¶20. As for Rachel, she testified that she had provided the children with clothes and cleaning items when a tornado hit in Mississippi and that she had given the children some Christmas gifts on another occasion. Aside from these statements, though, no other evidence reflected that Rachel sought to provide reasonably necessary food, clothing, or medical care during the three years the children were in CPS custody. With regard to shelter, both Nicholson and Clark testified that Rachel failed to provide them with any proof that she had obtained stable housing until a few days prior to the second day of the TPR hearing. Moreover, the evidence reflected that Rachel never provided proof to CPS that she actually "maintained" any shelter.

¶21. Nicholson testified that she continued to work with Rachel to find stable housing after Rachel's return to Mississippi in September 2016. In the two months prior to the TPR

10

hearing, however, Rachel told Nicholson that she was homeless. Although Rachel had initially moved in with Alex and his father, Rachel informed Nicholson that she left because Alex was drinking and had threatened her. At the time of the first TPR hearing date on May 12, 2017, Rachel lived with Alex's mother, who had kicked the family out of her home just prior to the children entering CPS custody. Nicholson testified that she conducted a home visit of Alex's mother's house but found that the housing arrangement failed to comply with Rachel's service plan and CPS policy. Between the two TPR hearing dates, Rachel moved out of Alex's mother's house and once again lived in her car. Just prior to the second TPR hearing date on July 19, 2017, Rachel finally secured suitable housing for herself and the children.

¶22. In granting TPR, the chancellor acknowledged that "some recent progress" had been achieved. He concluded, however, that "it was all too little, too late" and that the progress had only begun after the TPR proceedings were initiated. Upon review, we conclude the record supports the chancellor's finding that clear and convincing evidence existed to terminate parental rights due to Rachel's and Alex's unwillingness to provide reasonably necessary food, clothing, shelter, and medical care.

### B. Failure to Exercise Reasonable Visitation or Communication

¶23. The chancellor also found by clear and convincing evidence that Rachel and Alex failed to exercise reasonable visitation or communication with the children. Although Alex wrote the children letters during his incarceration, there was no evidence that he continued to communicate with them through phone calls or letters after being released. Further,

11

between the time of Alex's release in 2016 and the TPR hearing in 2017, the record reflects that Alex apparently only visited with the children twice in person.

¶24. Rachel maintained phone contact with the children while she lived in Oklahoma, but she did not see them in person for about three years. Rachel testified about a trip she took to New Orleans, Louisiana, on her way to Mississippi. During that trip, Rachel stated that she visited one of her other daughters and that daughter's children. Rachel did not, however, return to Mississippi during her time in Oklahoma to personally see Tina and Aaron. Further, even though Rachel moved back to Mississippi in September 2016, the record reflects that she did not actually see Tina and Aaron until about six months later around March 2017. The record also reflects that neither Rachel nor Alex scheduled a visit with the children during the two months between the first and second dates of the TPR hearing.

¶25. Nicholson testified that she attempted to work with Rachel, but Rachel would only contact her as court dates approached. Clark likewise stated that CPS tried to assist Rachel, but CPS "had a hard time talking with [Rachel]" because Rachel had "been very upset with Ms. Nicholson and ha[d] not wanted to work with the agency." Rachel confirmed during her own testimony that she disliked Nicholson and that she failed to communicate with Nicholson or go to Nicholson's office even though she knew she should coordinate with Nicholson to schedule visits with her children.

¶26. Based on such evidence, we find the record contained sufficient credible proof to support the chancellor's decision to terminate Rachel's and Alex's parental rights on this ground.

12

### C. Substantial Erosion of the Parent-Child Relationship

¶27. As a final ground for termination, the chancellor found that clear and convincing evidence demonstrated the parents' neglectful conduct had caused, at least in part, an extreme and deep-seated antipathy by Tina and Aaron toward their parents or some other substantial erosion of the parent-child relationship.

¶28. Nicholson testified that she had not personally observed any dislike by the children toward Rachel and Alex. Nicholson stated, however, that Aaron especially appeared to have no bond with either parent during his few visits with them. Nicholson further testified that, while Tina cared about her parents, being in foster care had adversely affected Tina's self-esteem. As previously discussed, Rachel did not physically see the children for about three years, and Tina told Nicholson that she sometimes felt depressed and wondered "why she really couldn't have contact with her mother . . . ."

¶29. The GAL testified that substantial erosion of the parent-child relationship appeared to have occurred due to the infrequency and inconsistency of the children's contact with their parents. Although Aaron knew Rachel and Alex were his biological parents, the GAL stated that Aaron did not interact with them as though they were his biological parents. The GAL further reported that Rachel's phone calls to the children would produce adverse effects when Rachel would make promises that she later failed to keep. The GAL stated that the adverse effects could especially be seen in Tina, who began struggling in school and exhibiting behavioral problems. The GAL testified, however, that both children were now thriving in the stable environment they had been provided for the past three years.

¶30. The chancellor concluded that prolonged absence and lack of communication between the parents and children had resulted in a substantial erosion of the parent-child relationship. Because clear and convincing evidence supported the chancellor's determination, we find no manifest error.

### D. Best Interests of the Children

¶31. After finding that clear and convincing evidence supported three statutory grounds for termination, the chancellor then considered whether TPR was in Tina's and Aaron's best interests. The chancellor concluded "[i]t would be an extreme injustice to these children to expose them to the extreme instability of the parents . . . after [the parents] failed to pull it together after so long." Credible evidence, including the GAL's recommendation and the testimony of both Clark and Nicholson, supported the chancellor's decision that reunification with Rachel and Alex was not desirable for obtaining a satisfactory permanency outcome for the children. We therefore affirm the chancellor's determination that TPR was in Tina's and Aaron's best interests.

### CONCLUSION

¶32. Because we find that clear and convincing evidence supported the chancellor's termination of Rachel's and Alex's parental rights, we affirm the chancellor's judgment.

¶33. **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR.**

14