# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00070-COA

**M.A.S.**                                                                                        **APPELLANT**

**v.**

**LAMAR COUNTY DEPARTMENT OF CHILD**                              **APPELLEE**
**PROTECTION SERVICES**

| | |
|---|---|
| DATE OF JUDGMENT: | 01/28/2020 |
| TRIAL JUDGE: | HON. BRAD ASHLEY TOUCHSTONE |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY YOUTH COURT |
| ATTORNEYS FOR APPELLANT: | KELLY GUNTER WILLIAMS |
| | CHAD KENNETH KING |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: STEVEN PATRICK WANSLEY |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 09/21/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLTON, P.J., WESTBROOKS AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.     On January 28, 2020, the Lamar County Youth Court entered a second amended

judgment[1] terminating M.A.S.'s parental rights related to her biological children, A.S., B.S.,

and C.S.[2]  The judgment to terminate parental rights was entered approximately nineteen

months following the entry of an adjudication order dated July 9, 2018, wherein the Lamar

---

[1] The original judgment terminating parental rights entered on December 17, 2019, and the amended judgment terminating parental rights entered on January 14, 2020, were amended pursuant to Mississippi Rule of Civil Procedure 60(a) for clerical mistakes.

[2] Initials have been used for the parties in this case to protect the identities of the minor children.

County Youth Court adjudicated A.S., B.S., and C.S. educationally neglected. Aggrieved by the court's judgment terminating her parental rights, M.A.S. appealed. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. A.A.S. and M.A.S. were husband and wife and had two children together, A.S. and B.S. A.S. was born in April 2011, and B.S. was born in March 2010. M.A.S. had another child, C.S., who was born in January 2006. While there is no father listed on C.S.'s birth certificate, R.B. is alleged to be her biological father. R.B. did not participate at any of the hearings in the adjudication proceedings or the termination of parental rights hearing.

¶3. On May 22, 2018, The Mississippi Department of Child Protection Services (CPS) received a report stating that B.S. had missed twenty days of school since January 2018 (ten excused and ten un-excused), and A.S. had missed twenty-two days of school since January 2018 (eleven excused and eleven un-excused). The report further alleged that the children often came to school dirty and never had snacks. Finally, the report stated that it was unknown whether M.A.S.'s home currently had electricity or running water. On the same day that the initial report was made, a school truancy officer went to M.A.S.'s home and explained to her that the children could not miss any more school.

¶4. The next day, May 23, 2018, CPS investigator Kaitlyn Swilley called the children's school to follow up on the report and was told that the children were again not at school. While at the school, Swilley was able to obtain a copy of the children's attendance records,

which showed that A.S. had missed thirty-four days since the beginning of the school year, and B.S. had missed thirty-five days of school since the beginning of the school year. Swilley immediately left the school and went to M.A.S.'s home to conduct a wellness check. When Swilley arrived at M.A.S.'s home, she made initial contact with A.S., and after he stated that M.A.S. was at home, Swilley asked if she could speak to her. The children's grandmother poked her head out of the back window of the home and told Swilley that M.A.S. was not home and that she could not let Swilley speak to the children without talking to her first. Swilley gave the grandmother her cell phone number and told her to have M.A.S. call her concerning the home visit. During her visit to M.A.S.'s home, Swilley observed that the air-conditioning unit was functioning, which verified that the home had electricity. M.A.S. immediately called Swilley and told her that she would not be able to speak with her until Monday, May 28, 2018, and stated that the children had strep throat and may not be at school for the rest of the week. M.A.S. said the children had very low immune systems, and they missed school at least once a month. Swilley explained to M.A.S. that the matter could not wait until Monday and that she needed to speak to the children within twenty-four hours. M.A.S. stated that she "had read all of the CPS policy," and she knew that Swilley had seventy-two hours to speak to the children.

¶5.     On May 24, 2018, Swilley went back to M.A.S.'s home to make contact with the children. When she arrived at the home, the children and their grandmother were all present, but M.A.S. was not there. The grandmother advised Swilley once again that she could not

speak to the children without M.A.S.'s permission. After Swilley left the home, M.A.S. called Swilley on her cell phone and told her again that she would not allow her to talk to the children until Monday, May 28, 2018, and that Swilley could not speak to the children without her being present. After M.A.S.'s call, Swilley's supervisor, Tiya Jones, contacted the youth court judge regarding M.A.S.'s lack of cooperation, and the court entered an emergency custody order granting CPS immediate custody of A.S. and B.S.[3] Swilley returned to M.A.S.'s home with the emergency court order allowing them to take custody of A.S. and B.S. M.A.S. answered the door, ripped up the court order, and refused to relinquish custody of her children. While Swilley waited on law enforcement to assist with the children's removal, M.A.S. fled the home with A.S. and B.S. Law enforcement ultimately convinced M.A.S. to return home with the children. When Swilley was finally able to enter M.A.S.'s home, she was able to observe the conditions of the home. Swilley's report described the home as follows: "in poor conditions with dog feces on the floor and in the bathroom, clothes and trash laying all through the trailer, and there was a strong odor. The children were observed to have on dirty clothes, they had a strong body odor, and they appeared to not have been bathe[d]." While examining M.A.S.'s home, Swilley realized that an additional child, C.S., was residing in the home. Given the condition of the home, CPS contacted the youth court judge again and requested emergency custody of C.S. as well. All three children were taken into CPS's custody. Once the children were removed from the

___

[3] The initial report made to CPS only mentioned A.S. and B.S.; however, C.S. was found residing in M.A.S.'s home when the investigators entered the home.

home, they were taken to a doctor for an infestation of head lice and were prescribed lice treatments.

¶6.	Over the course of their investigation, CPS also discovered that the special education department from the children's school had been trying to contact M.A.S. regarding A.S.'s individualized education program (IEP). Because M.A.S. was unresponsive, the school had been unable to complete A.S.'s evaluation to determine if he qualified for certain services to assist him in school. Swilley's report also stated that "due to the family's history of drug use, [M.A.S.] was asked to submit to a drug screen that was provided for her . . . ." Each of the factors set out in Swilley's report (the conditions of the home, the children's hygiene, the number of days that the children had missed school, education needs not being met, and the history of drug abuse) led to CPS's recommendation that A.S., B.S., and C.S. be adjudicated neglected children.

¶7.	A "shelter hearing"[4] was held on May 29, 2018, in the Youth Court of Lamar County. M.A.S. was present at the shelter hearing without counsel. Pursuant to the shelter order entered on the same day, the youth court ordered that the Lamar County Department of Child Protective Services continue to maintain custody of A.S., B.S., and C.S. The order further adopted a permanency plan of reunification with the parents and a concurrent plan of durable legal custody or legal guardianship. At the hearing, the court appointed Tangi Carter to represent M.A.S. as a parent representative throughout the adjudication process.

_____

[4] *See* Miss. Code Ann. § 43-21-309 (Supp. 2017); U.R.Y.C.P. 16.

¶8.     On June 7, 2018, the Lamar County prosecuting attorney filed a petition alleging that A.S., B.S., and C.S. were neglected children pursuant to Mississippi Code Annotated section 43-21-105(1) (Supp. 2017) based on the events previously discussed. Following the filing of the petition, the youth court conducted an adjudication and disposition hearing on June 26, 2018.[5]

¶9.     At the onset of the adjudication hearing, the judge told M.A.S. and A.A.S:

> [A]s you know, this is an adjudication hearing to determine if these children will be adjudicated neglected. If they are, we'll have a separate disposition hearing to determine what disposition will be made in their case—in other words, where they will be placed.

M.A.S. and A.A.S. were represented at the hearing by Tangi Carter. CPS supervisor Tiya Jones testified at the adjudication hearing as to the contents of Swilley's report and the events leading up to the emergency custody order. Outside of the facts previously discussed, Jones testified that the children had multiple absences from school just prior to the most recent report and, more specifically, on May 17, 18, 20, and 22. Jones further testified that A.S. had previously repeated kindergarten because of the number of days he missed the previous year and that currently he was barely passing. In addition to the infestation of head lice, A.S. tested positive for mononucleosis immediately after removal from M.A.S.'s home. B.S. tested negative for mononucleosis, but her tonsils were extremely swollen, indicating that she had previously had it or was about to have it. Jones testified that "due to a history of drug

_____

[5] The front page of the court transcript dated June 26, 2018, indicates that the transcript covered both the adjudication hearing and the disposition hearing. However, it is clear from the contents of the transcript that there was only one hearing.

use with the family," the agency requested M.A.S. and A.A.S. each to submit to a drug screen. As of the date of the adjudication hearing, neither M.A.S. nor A.A.S. had complied with the agency's request. M.A.S.'s attorney provided negative drug screens on the day of the hearing, but they were not processed by the lab that the youth court requested be used. Notably, Swilley's report also stated in part:

> The agency has a long history with [M.A.S.] and her family. We have been receiving reports alleging abuse and neglect since April 2, 2002.[6] There have been [twenty-seven] reports received to the agency concerning the mother's drug use, driving while under the influence, poor living conditions of the home, multiple reports of the children receiving head lice, and truancy issues. Out of the [twenty-seven] reports, [four] reports have been evidenced for physical neglect. Two reports were substantiated based off of the two children testing positive for marijuana at birth.

At the conclusion of the hearing, the court declared all three children to be neglected and adopted a plan of reunification with the natural parents. The judge directed M.A.S. and A.A.S. to "go take a drug screen that they send you to take. Then we'll review the case on July 24. . . . We'll see you back then." The adjudication order was entered on July 9, 2018. A disposition order was also entered on July 9, 2018, despite the fact that there was no separate hearing. Pursuant to the disposition order, A.S., B.S., and C.S. were placed in the custody of Lamar County CPS with a permanency plan of reunification with the biological parents and a concurrent plan of durable custody.

---

[6] The CPS report indicates that they had been receiving abuse and neglect reports concerning M.A.S. and A.A.S. since April 2, 2002. However, none of the minor children were born as of 2002. Thus, there was likely a typographical error, and perhaps it should have read "2012."

7

¶10.   On July 24, 2018, the youth court conducted a review hearing.[7]   M.A.S. was represented by Anna Rush at the hearing.  Family protection specialist Blair Noland testified on behalf of CPS.  Noland testified regarding the children's progress in school and indicated that they had been regularly attending dental and doctor's appointments.  She testified that the agency held a family team meeting with M.A.S. on July 9, 2018, and they discussed and developed a service agreement.  However, as of July 19, 2018, the service agreement had not been signed by M.A.S. or A.A.S., nor had either of them submitted to a drug screen with Court Programs Inc. (Court Programs).  Noland testified that she did a walk-through of M.A.S.'s home on July 19, 2018, and it was clean and clutter free at that time.  M.A.S. exercised visitation with C.S. on July 9, 2018; however, she did not show up for the following visitation scheduled on July 19, 2018.   Finally, Noland testified that CPS recommended all three children remain in CPS custody for further supervision.  At the conclusion of the hearing, the court ruled from the bench that:

> The children will remain in the legal custody of the Agency.  We're going to do a trial home placement provided I get two negative drug screens. . . . The children will remain in the custody of the foster parents.  And we have court on August 7.  I'm going to look at it on August 7th.

A permanency order was entered on July 26, 2018.

¶11.   On August 7, 2018, the youth court conducted another review hearing.  M.A.S. was present with counsel.  At that hearing, Lamar County CPS Supervisor Kimberly Thomas

---

[7] The transcript's cover sheets refer to the July 24, 2018 and subsequent review hearings as permanency hearings.

testified on behalf of the agency. Thomas testified that M.A.S. and A.A.S. signed their service agreement that morning prior to the hearing, nearly a month after it was initially prepared on July 9, 2018. [8] Their service agreement consisted of mental health assessments, parenting classes, random drug screens, stable housing, regular contact with the agency, maintaining visits with the children, and participation in the children's education. Further, she testified that the agency had arranged family visits for the parents on July 20, July 27, and August 3; however, neither parent attended any of the visits. Finally, Thomas testified that the agency continued to struggle with trying to get M.A.S. and A.A.S. to comply with drug screen requests. She testified that the agency requested drug screens on July 9, July 19, and July 24. Finally, on August 1, 2018, M.A.S. contacted the agency and stated that they were ready to take a drug screen. M.A.S. was informed that the previously ordered drug screen had expired, but another order was being processed and would be available on August 2, 2018. On August 3, 2018, M.A.S. and A.A.S. refused to complete the drug screen at Court Programs because it was a hair-follicle screen. M.A.S. testified that she and A.A.S. did complete a urine test at Court Programs, and she stated that those screens were negative. At the conclusion of the hearing, the youth court stated in part:

> I'll probably regret this, but I'm going to try it. I'm going to give you a ninety-day home placement starting today. [M.A.S.], you've got to do the drug screens. I don't want an excuse that I went up there and they wanted to do a hair follicle, and I didn't want to do that. You do whatever they tell you to do.

[8] The family service plan indicates that M.A.S. signed the plan on July 24, 2018. While the handwritten date appears to read "2017," family protection worker Torjai Ashford testified that the plan was actually signed on July 24, 2018.

9

And these kids better not miss any school.

A permanency order was entered on August 16, 2018, and a review hearing was set for November 13, 2018.

¶12. On November 13, 2018, the youth court conducted another review hearing at which neither M.A.S. nor A.A.S. were present; however, their counsel did attend. Ashford updated the youth court on both the children's school attendance and the parents' drug screens. Ashford testified that A.S. and B.S. had each missed five days of school, and C.S. had missed twelve days of school during the ninety-day trial custody period. She further testified that neither M.A.S. or A.A.S. had submitted to drug screening or produced any kind of documentation in compliance with their service agreement. Ashford requested that legal custody of the minor children remain with Lamar County CPS and that the matter be reviewed in thirty days to monitor compliance with the drug screens and school attendance. At the conclusion of the hearing, the court ruled in part to "continue the trial home placement, and review the case on [December 11]. . . . If you will, tell [M.A.S.] that if I don't have a clean drug screen on the 11th, I'm removing these children from the home again."

¶13. On December 11, 2018, the youth court conducted a review hearing to evaluate M.A.S.'s compliance with the service agreement and the directives given by the youth court at the hearing on November 13, 2018. M.A.S. was present at the hearing with counsel. Ashford testified for the agency and stated that M.A.S. still had not taken a drug test that was requested by the agency. M.A.S. reported to Ashford that she went to take a drug test at

Culpepper Drug Testing; however, when Ashford called Culpepper, they had no record of her taking a test. The children had only missed one day of school, and Ashford verified that the children were actually sick on that day. Ashford recommended that M.A.S. and A.A.S. be afforded the opportunity to go to Court Programs that day and take the drug screen. Ashford testified that if the drug screens were negative, the agency would recommend that the children be removed from Lamar County CPS's custody; however, if the drug screens were positive, the children should remain in the legal custody of Lamar County CPS, removed from the parents' home, and subject to a review hearing in ninety days. At the conclusion of the hearing, the youth court stated:

> I don't know what you don't understand. You've got to take a drug test at Court Programs, not a place you choose, not a place your husband chooses. Court Programs today. If you don't, I'm going to take your children out of your home again. . . . I'll take it under advisement until next Tuesday.

¶14. Pursuant to the youth court's directive, M.A.S. and A.A.S. took drug tests at Court Programs on December 11, 2018. M.A.S. tested positive for methamphetamines and amphetamines. A.A.S. testified positive for methamphetamines, amphetamines, and marijuana. The children were removed from their parents' custody on that same day. On December 18, 2018, the youth court reviewed the drug test result, and family protection worker Ashford testified for the agency. Ashford testified that when the children were removed from M.A.S.'s home, their heads were once again covered in lice, but they had all been treated and were doing well. Ashford also testified that the agency was working on placing the children with a family member after the first of the year. On January 4, 2019, the

11

youth court entered an order wherein the children would remain in foster care placement until a review hearing on March 26, 2019.

¶15. On March 26, 2019, the youth court conducted a hearing to review the permanency plans for all three of the minor children and to determine if any changes needed to be made as a result of the positive drug screens. M.A.S. was present at the hearing with counsel. Ashford testified on behalf of the agency and stated that both M.A.S. and A.A.S. had been unresponsive to the agency in furtherance of the reunification plan. Ashford testified:

> In regards to [M.A.S.] and [A.A.S.], I have not made any contact with them. . . . [M.A.S. has] given me a fake drug test one time. . . . I don't know what she's doing now. She has not come in to talk to me. I've tried to call her on the phone. A couple of times the phone was off. I went by the house one time, and no one was there. The lights were off. It was quiet. The dog was barking in the house.

According to Ashford there was a family team meeting scheduled for March 22, 2019, but neither M.A.S. nor A.A.S. showed up. Ashford testified that despite the fact that the agency was working with a family member for the children's permanent placement, custody with that family member was no longer a viable option, and the agency was exploring additional relatives for custody. On the date of the hearing, the agency's recommendation was that legal and physical custody of the minor children remain with Lamar County CPS and that the permanency plan of reunification be changed to adoption with a concurrent plan of durable legal custody. Ashford testified that she had less contact with A.A.S. than she had with M.A.S. and no contact whatsoever with C.S.'s alleged father R.B. As a result, Ashford requested that the agency not be required to make any additional reasonable efforts toward

12

reunification with any of the biological parents. At the conclusion of the hearing, the court ruled in part:

> [M.A.S.] has had ample opportunity to work with the Agency towards reunification and has failed to do so. Likewise, the same with the fathers. There has been no effort whatsoever to work towards reunification with these children. . . . The Court does think its in the best interest that we move this case to where the children can have some stability and permanency. The Court is going to adopt the Agency's recommendation that the plan be changed to adoption with a concurrent plan of durable legal custody. The court further orders that no reasonable efforts have to be made to work towards reunification with the parents. We will review this case in ninety days.

A permanency order was entered on April 5, 2019, and the case was set for another review hearing on June 18, 2019.

¶16.    On May 1, 2019, M.A.S., by and through her attorney, filed a motion to reconsider the permanency plan, alleging that it was in the children's best interest to reinstate a permanency plan of reunification and a concurrent plan of durable legal custody with M.A.S.'s sister. Notably, there were no claims of procedural errors in the adjudication process asserted in M.A.S.'s motion for reconsideration.

¶17.    On June 18, 2019, the youth court conducted a review hearing wherein the court also considered M.A.S.'s motion to reconsider the permanency plan. M.A.S. and A.A.S. were present at the hearing without counsel. Torjai Ashford testified again on behalf of CPS. She testified the children were doing better in school, and all had progressed to the next grade level. According to Ashford, M.A.S. and A.A.S. continued to make some visits with the children despite the fact that CPS had been released of any obligation to continue to work

with them. Since the last review hearing, the agency received an additional report concerning M.A.S. and A.A.S. Ashford's case-review report summarized the new report as follows:

> [M.A.S. and A.A.S.] were using their niece['s] urine to pass their drug screens for CPS. In addition, the report alleged that the home has black mol[d] with no working power. The family is running a cord from the sister's home. The report stated they were making the report out of concern and they did not want the children to go back home in that situation.

Ashford testified that the agency was continuing to work toward the plan of adoption and recommended that legal and physical custody remain with Lamar County CPS to be reviewed in ninety days. M.A.S. testified that the contents of the report to CPS was a lie. She argued that there was nothing wrong with her home and provided pictures for the court's review. According to M.A.S., CPS failed to make reasonable efforts toward the permanency plan of reunification. M.A.S. testified that she had not used drugs in "six or seven months." At the conclusion of the hearing, the youth court stated in part:

> [I]n order for me to even entertain changing the plan, I have to be satisfied that you are sober. Both of you. . . . I want y'all to go submit to a drug test today, straight from here. . . . I'll consider it when I review the case in ninety days. . . . [I]f either one of them come back positive, then I'm not going to order [CPS] to do anything else with them. If you get negative drug screens today, I would like [CPS] to continue if they are willing to do so and monitor that for me.

A permanency order was entered on June 24, 2019, leaving physical and legal custody with Lamar County CPS and the case was set for another review hearing on September 24, 2019.

¶18. On September 24, 2019, the youth court conducted a review hearing to follow up on the drug screens requested by the court at the previous hearing. M.A.S. and A.A.S. were

14

present with counsel. Torjai Ashford testified on behalf of CPS. According to Ashford, the children were thriving in school and up to date on all medical and dental appointments. Since the last review hearing, a petition to terminate parental rights (TPR) and a motion to appoint a guardian ad litem (GAL) was filed on August 12, 2019, and the date for the TPR hearing was set for October 22, 2019. Ashford testified that neither M.A.S. nor A.A.S. had submitted to the drug screen requested at the prior hearing. Ashford stated that she sent the paperwork to Court Programs immediately following the hearing on June 18, 2019. Court Programs advised Ashford that M.A.S. and A.A.S. came in around 3:15 p.m., stayed a few minutes, and left. M.A.S. testified that she and A.A.S. went to Court Programs, stayed until 4:00, and left because the drug screen paperwork was not there. She maintained, though, that she and A.A.S. took a drug test the day before the current hearing. Notably, M.A.S. failed to provide any documentation of that drug screen. According to Ashford, the agency was working with Canopy Solutions on an adoption placement for the children. At the conclusion of the hearing, the youth court ruled that legal and physical custody of the minor children should remain with Lamar County CPS. A permanency order was entered on September 30, 2019, and the case was set for another review hearing on March 24, 2020.

¶19. The TPR hearing was originally scheduled for October 22, 2019; however, the court continued the hearing until December 10, 2019, after it was discovered that A.A.S. was not served properly and M.A.S. requested additional time to hire an attorney.[9] On December 10,

_____

[9] There are no transcripts from the original October 22, 2019 TPR hearing; however, the court alludes to these facts in the transcript for the December 10, 2019 TPR hearing. At

15

2019, the Lamar County Youth Court held a hearing on the State's petition to terminate the parental rights of M.A.S., A.A.S., and R.B. An order appointing the GAL and the GAL's report were entered on the same day as the hearing.[10] M.A.S. and A.A.S. were not represented by counsel at the December 10, 2019 TPR hearing. At the onset of the TPR hearing, M.A.S. requested that the case be continued again because she had been approved for a legal-aid attorney, but one would not be able to assist her until the beginning of January. The judge denied her request by stating, "I've already given you a continuance for a lawyer. . . . I'm not continuing this case today for that reason." The court also stated, "[I]f you want to hire a lawyer and appeal this, you can."

¶20. Torjai Ashford was the first witness for the State to testify on behalf of CPS. The State made several motions to amend its pleadings to conform to the evidence at the onset of its direct examination of Ashford.[11] The motions were granted, and the pleadings were amended accordingly. Ashford primarily testified to the specific facts leading up to the

---

the December 10, 2019 TPR hearing the youth court asked M.A.S. about her previous court-appointed counsel and stated, "Okay. So you are going to – like I said, the Court has appointed you counsel You apparently fired, I guess Mrs. Carter." In response M.A.S. stated, "Yes, sir. I just don't want an attorney that can't file an appeal for me. That just – it don't make no sense." The youth court responded, "All right. Well, we're going to proceed today. Again this Court did give you opportunity to retain counsel. You apparently have not done so."

[10] The GAL, Cynthia Re, was previously appointed as the GAL for the minor children in January 2019. The court re-appointed her on December 10, 2019, for the TPR hearing.

[11] The State's petition to terminate parental rights had several clerical errors including A.S.'s birthday, the date that the children were placed in the care and custody of CPS, and the date that the children were adjudicated neglected children.

16

agency's receiving the report on May 22, 2018, concerning A.S. and B.S. and the events that followed ultimately led to the filing of the TPR petition. Ashford also testified that M.A.S.'s family had twenty-seven prior reports of alleged drug use, truancy issues, "deplorable home" conditions, and unpaid utility bills. Four of those reports were substantiated. Further, two of M.A.S.'s children were born with marijuana in their system. She testified that prior to taking custody of the children in 2018, CPS took custody of the minor children in 2015 under similar circumstances.

¶21. Ashford testified that CPS developed a service agreement for both M.A.S. and A.A.S. in conjunction with the 2018 report and explained to them the importance of completing the agreement; however, neither of them followed through with its completion. According to Ashford, M.A.S. and A.A.S. both had an ongoing "issue with drug abuse," and therefore CPS requested that they submit to random drug screens. Ashford testified that they refused drug screens at least twice a month throughout the youth court's review hearing process. Ashford stated, "I would beg [M.A.S.] to go. Please, I'd say. Your kids are going to be removed if you don't. All [M.A.S.] would do was cry." On December 11, 2018, M.A.S. and A.A.S. finally submitted to drug screens through Court Programs only after they were ordered by the youth court to do so immediately following one of the numerous review hearings. A.A.S. tested positive for methamphetamines, amphetamines, and marijuana, and M.A.S. tested positive for methamphetamines and amphetamines. Further, neither M.A.S. nor A.A.S. ever submitted to a mental health assessment as required by the service agreement.

17

¶22. Ashford testified that neither M.A.S. nor A.A.S. had provided the minor children with necessary food, clothing, or shelter with any consistency. She related only one instance where M.A.S. and A.A.S. invited the children to go to the mall, gave them money, and took them out to eat. According to Ashford, there had been some communication among M.A.S., A.A.S., and the children, but both parents had missed multiple scheduled visits with the children. Ashford testified that the sporadic visitation had caused an erosion of the relationship between the parents and the children. At the conclusion of her testimony, Ashford recommended that "the parents' rights [be] terminated so the children have some permanency and can be adopted." Other than the GAL, the State did not put on any additional witnesses at the TPR hearing.

¶23. M.A.S. was the only witness who testified on her behalf at trial. She began by stating that she did not have a strained relationship with her kids. She testified that "they don't hate me or resent us or anything." M.A.S. admitted that she and A.A.S. had not had many visits with the children during the time that the kids were in foster care. She also admitted that the children had missed several days of school. M.A.S. denied that her home was unlivable. She admitted that it "was not the cleanest in the world, but . . . I had water. I had lights. I had food."

¶24. M.A.S. argued at trial that CPS failed to make reasonable efforts to reunify her and A.A.S. with the minor children. She alleged that Ashford had gone months without making contact with either her or A.A.S. and did not make an effort to set up visitations with them

18

and the children. M.A.S. testified, "I'm not blaming everything on CPS. **I understand what we did wrong**. But it's not . . . enough to just rip my kids away from us." (Emphasis added). Finally, during her direct statement to the court, M.A.S. testified that she and A.A.S. had turned in clean drug screens that they paid for themselves; however, she did not bring any of those tests for the court's review on the day of the TPR hearing.

¶25. On cross-examination, M.A.S. admitted that while she claimed that the children had certain medical conditions that caused them to miss school, these conditions were not the sole reason for their school absences. M.A.S. testified that there were "some that were my fault. They missed the bus and I didn't have a ride." Also during cross-examination, M.A.S. admitted that she had some issues with drug use.

¶26. Cynthia Re, the court-appointed GAL, was the last witness to testify at the TPR hearing. Re testified that she became the GAL in the case in January 2019 after taking over the file from the previous GAL Kristen McGee and was re-appointed by a separate order dated December 10, 2019, for the purposes of the TPR hearing. Re testified that her file included a case history dating back to a report made on May 22, 2018, and included notes regarding the family's history with CPS prior to the instant report. After giving a narrative of the case history previously discussed herein, Re gave her recommendation that the court should find that the State met its burden by clear and convincing evidence required by Mississippi Code Annotated sections 93-15-115 (Supp. 2017) and 93-15-121 (Supp. 2017) to terminate the parental rights of M.A.S. and A.A.S. Re testified that while the children

loved their parents, they also desired stability, which she felt was something they could not receive from M.A.S. and A.A.S.

¶27. At the conclusion of the trial, the court held that it had jurisdiction of over the proceeding pursuant to Mississippi Code Annotated section 93-15-105. Further, the court held in part:

> The [children], based on the testimony in evidence, by clear and convincing evidence . . . were adjudicated neglected. . . . The Department did develop a Service Plan with [M.A.S. and A.A.S.] to effect reunification with the children. . . . However, the parents did fail to substantially comply with terms of that Service Agreement. Reunification with these parents would not be in the best interest of the children. The Court also finds that termination of parental rights is appropriate. . . . The Court does find by clear and convincing evidence that M.A.S. and A.A.S. do suffer from a habitual drug addiction and that they have been unable to get control of that addiction. . . . Therefore, the court find[s] grounds for termination under § 93-15-121(c) as to [M.A.S. and A.A.S]. The Court also finds that this neglectful behavior has at least in part contributed to a substantial erosion of the relationship between the parents and the child.

Finally, the court advised M.A.S. and A.A.S. that they had thirty days to appeal the judgment if they wished to do so. A judgment terminating M.A.S and A.A.S.'s parental rights was entered on December 17, 2019. An amended judgment was entered on January 14, 2020, and a second amended judgment was entered on January 28, 2020. The subsequent orders were entered to rectify clerical errors to the prior judgment.

¶28. M.A.S. filed her notice of appeal in forma pauperis on January 16, 2020. The court entered an order on January 28, 2020, directing M.A.S. to file a motion for leave to appeal in forma pauperis by February 7, 2020, and set the motion to be heard on February 18, 2020.

20

On February 10, 2020, M.A.S. filed a motion for extension of time and a motion for continuance and other relief in which she requested additional time to file her motion and requested that the February 18th hearing be continued. By virtue of an order dated February 10, 2020, M.A.S. was granted additional time to file her motion; however, the court did not move the hearing date from February 18, 2020. M.A.S. filed her motion for leave to appeal in forma pauperis on February 14, 2020. On February 20, 2020, the court entered an order denying motion to proceed in forma pauperis on appeal. On April 2, 2020, the Mississippi Supreme Court entered an order wherein M.A.S.'s motion for leave to appeal in forma pauperis was granted.

¶29. M.A.S. argues three issues on appeal as follows: (1) the youth court lacked jurisdiction over the educational neglect proceedings, therefore barring the termination of parental rights; (2) the youth court lacked jurisdiction over the termination-of-parental-rights action; and (3) the court erred in finding clear and convincing evidence that M.A.S.'s parental rights should be terminated. Finding no error, we affirm the ruling of the Lamar County Youth Court.

**STANDARD OF REVIEW**

¶30. The appellate standard of review is the same for both youth court proceedings and chancery court proceedings. *In re J.P.*, 151 So. 3d 204, 208 (¶9) (Miss. 2014). "The county court's 'findings of fact concerning the termination of parental rights are viewed under the manifest error/substantial credible evidence standard of review.'" *C.S.H. v. Lowndes Cnty.*

21

*Dept. of Human Servs.*, 246 So. 3d 908, 913 (¶21) (Miss. Ct. App. 2018) (quoting *W.A.S. v. A.L.G.*, 949 So. 2d 31, 34 (¶7) (Miss. 2007)). On appeal, this Court is tasked with determining "whether credible proof supports the county court's factual findings by clear and convincing evidence." *Id*. at 913-14 (¶21). However, questions of law are subject to de novo review, "and if a chancellor misapprehends the controlling rules of law or acts pursuant to a substantially erroneous view of the law, reversal is proper." *Chism v. Bright*, 152 So. 3d 318, 322 (¶12) (Miss. 2014).

## ANALYSIS

I. **Did the youth court lack jurisdiction over the underlying educational neglect action, therefore barring the termination of M.A.S.'s parental rights?**

¶31. M.A.S. argues on appeal that the Lamar County Youth Court lacked jurisdiction over the underlying educational neglect action by virtue of several procedural errors, and therefore the termination of her parental rights was barred. More specifically she claims (1) that her due process rights were violated as a result of faulty service of process and non-compliance with the Youth Court Act; (2) that the petition to adjudicate the minor children neglected was insufficient to place M.A.S. on notice of the issues to be argued at the adjudication hearing; (3) the youth court failed to conduct the disposition hearing separately and apart from the adjudication hearing in accordance with the provisions of the Youth Court Act; and (4) the youth court failed to consider reasonable alternatives to custody.

¶32. Following the shelter hearing on May 29, 2018, the youth court conducted ten

hearings ending with the TPR hearing on December 10, 2019. M.A.S. was represented by counsel at eight of the ten hearings, on June 26, 2018; July 24, 2018; August 7, 2018; November 13, 2018; December 11, 2018; December 18, 2018; March 26, 2019; and September 24, 2019. At no time during any of those eight hearings did M.A.S.'s counsel object to any jurisdictional errors alleged to have occurred during the adjudication process. Further, M.A.S.'s counsel failed to perfect an appeal arising from the adjudication order entered on June 26, 2018. Therefore, M.A.S. has waived her claims regarding the underlying educational neglect action. Notwithstanding her waiver, M.A.S.'s arguments are discussed further below.

### A. Service of Process and Compliance with the Youth Court Act

¶33. M.A.S. argues that the youth court failed to issue her a summons to perfect the requisite service of process. She further argues that the youth court failed to comply with the requirements of Mississippi Code Annotated section 43-21-557(1)-(2) (Rev. 2015). More specifically she claims that the youth court failed to "ascertain whether the notice requirements had been complied with, or if the parties intelligently waived their due process rights" and "failed to engage the parties and explain their rights."

¶34. Mississippi Code Annotated section 43-21-501(1) (Rev. 2015) states:

> (1) when a petition has been filed and the date of the hearing has been set by the youth court, the judge or his designee shall order the clerk of the youth court to issue a summons to . . . . (c) the parent or guardian of the child if such parent or guardian does not have custody of the child.

23

Further, Mississippi Code Annotated section 43-21-507(1) (Rev. 2015) states that "[s]ummons shall be served not less than three (3) days before the date set for the adjudicatory hearing of proceedings concerning the child." Finally, Mississippi Code Annotated section 43-21-557(1) states in part:

> At the beginning of each adjudicatory hearing, the youth court shall: . . . . (c) ascertain whether the notice requirements have been complied with and, if not, whether the affected parties intelligently waived compliance in accordance with Section 43-21-507; . . . and (e) explain to the parties: (i) the right to counsel; (ii) the right to remain silent; (iii) the right to subpoena witnesses; (iv) the right to cross-examine witnesses testifying against him; and (v) the right to appeal.

¶35. As previously stated, it is important to note that neither the adjudication order nor the disposition order, which were both entered on July 9, 2018, were ever appealed. Further, the only judgment subject to the current appeal is the judgment terminating M.A.S.'s parental rights. However, the adjudication petition was filed on June 7, 2018,[12] and a summons was issued for M.A.S. on that same day for the hearing scheduled on June 26, 2018. The youth court docket indicates that M.A.S. was personally served for the adjudication hearing on June 16, 2018, ten days prior to the adjudication hearing, in compliance with Mississippi Code Annotated section 43-21-507. Further, M.A.S. was present at the adjudication hearing on June 26, 2018, with counsel ready to proceed. There were no objections made by counsel at the time of the adjudication hearing concerning any service-of-process issues, and the hearing was conducted as scheduled. Therefore, this issue is without merit.

---

[12] The youth court docket indicates that the petition was filed on May 30, 2018; however, the petition was stamp filed on June 7, 2018.

24

¶36. While M.A.S. now asserts error by the youth court's failure to comply with Mississippi Code Annotated section 43-21-557, this Court has previously held that the "failure to comply with Section 43-21-557 does not necessarily result in automatic reversal." *In re L.C.A.*, 938 So. 2d 300, 306 (¶19) (Miss. Ct. App. 2006). In *In re L.C.A.*, a child was represented by counsel at an adjudication hearing, and counsel did not object to or call into question the court's failure to explain section 43-21-557 to his client. *Id*. This Court held that the youth court's failure to explain section 43-21-557 was harmless error at best. *Id*. Further, in *Cortesi v. Washington Cnty. Dep't of Human Servs.* (*In re T.L.C.*), 566 So. 2d 691, 699 (Miss. 1990), *overruled on other grounds by D.T. v. Hinds Cnty. Youth Ct. (In re. J.T.)*, 188 So. 3d 1192, 1201-02 (¶¶49-51) (Miss. 2016), a biological father was represented by counsel during both the adjudication and disposition hearings, wherein counsel cross-examined witnesses and gave closing arguments. The supreme court held that "while conscientious practice counsels that the youth court follow the procedure concerning notification of parties' rights, in this case Roy Cortesi can point to no denial of any right that would make the hearings any less fair. The error, if any is harmless." *Id*.

¶37. In this case, M.A.S. was represented by counsel at the adjudication hearing. At no point did M.A.S.'s counsel object to or make any complaint about the youth court's failure to comply with Mississippi Code Annotated section 43-21-557. Counsel proceeded to represent M.A.S. and engage in litigation by cross-examining witnesses and called M.A.S. to testify on her own behalf. As such, any error, if any, is harmless, and this issue without

merit.

**B.     Sufficiency of the Underlying Petition for Educational Neglect and Sufficiency of the Evidence at the Adjudication Hearing**

¶38.     M.A.S. asserts that the State's petition to adjudicate the minor children neglected was insufficient on its face to place her on notice that her alleged drug use would be "inquired into at the adjudicatory hearing and would be the basis for the State's continued custody of their minor children." She further alleges that the testimony at the adjudication hearing was insufficient to substantiate a finding of neglect.

¶39.     The requirements for a petition seeking an adjudication that a child is a neglected child or abused child are set forth in Mississippi's Uniform Rule of Youth Court Procedure 20. Rule 20 (c)(4) states in part, "The petition shall set forth plainly and concisely with particularity: . . . (iii) a statement of the facts, including the facts which bring the child within the jurisdiction of the youth court and which show the child is a neglected child or an abused child." For the purposes of interpreting the Mississippi Youth Court Law, the definition of "neglected child" has the same meaning as set forth in Mississippi Code Annotated section 43-21-105(l), which states:

> (l) "Neglected child" means a child:
>
> > (i) Whose parent, guardian or custodian or any person responsible for his care or support, neglects or refuses, when able so to do, to provide for him proper and necessary care or support, or education as required by law, or medical, surgical, or other care necessary for his well-being;
> > . . .

26

(ii) Who is otherwise without proper, care, custody, supervision or support; or . . .

(iv) Who for any reason, lacks the care necessary for his health, morals or well-being.

*See also* U.R.Y.C.P. 4.

¶40. In this case, Count I of the petition sets out the allegations from the report received by CPS on May 22, 2018. More specifically, the petition stated that A.S. had missed twenty-two days of school since January and that B.S. had missed twenty days of school since January. Further, the petition alleged that the children "come to school dirty and never have snacks, as well as it is unknown if there is electricity and running water in the home." The central issue of this proceeding was neglect, and clearly the facts of the petition were sufficient to "bring the case within the jurisdiction of the youth court." While the petition did not refer to M.A.S.'s drug use per se, Jones testified at the adjudication hearing that "due to a history of drug use with the family," the agency requested M.A.S. and A.A.S. each submit to a drug screen. Notably, the CPS report that was introduced as an exhibit at the hearing also stated in part:

> The agency has a **long history with [M.A.S] and her family**. **We have been receiving reports alleging abuse and neglect since April 2, 2002.**[13] **There have been [twenty-seven] reports received to the agency concerning the mother's drug use, driving while under the influence**, poor living conditions of the home, multiple reports of the children receiving head lice, and truancy issues. Out of the [twenty-seven] reports, [four] reports have been evidenced for physical neglect. **Two reports were substantiated based off of the two children testing positive for marijuana at birth**.

---

[13] This date most likely is a typographical error and should be April 2, **2012**.

27

(Emphasis added). Given M.A.S.'s extensive history with the youth court, it should come as no surprise to M.A.S. that the court would inquire into potential drug use. Therefore, this issue is without merit.

¶41. M.A.S. further alleges that the evidence presented at the adjudication hearing was insufficient to support the adjudication order wherein the minor children were found to be neglected and removed from her home. However, M.A.S. did not appeal the adjudication order. Therefore, M.A.S. has waived her argument considering the sufficiency of the evidence at the adjudication hearing. In any event, the evidence presented, as set forth above, was sufficient to support the adjudication order.

### C. Failure to Conduct a Disposition Hearing in the Underlying Neglect Proceedings.

¶42. M.A.S. argues that the youth court failed to protect the best interest of the minor children by failing to comply with Mississippi Code Annotated section 43-21-601(1) (Rev. 2015) and not having a separate disposition hearing following the adjudication hearing. Section 43-21-601(1) provides:

> (1) If the child has been adjudicated a delinquent child, a child in need of supervision, a neglected child or an abused child, the youth court shall immediately set a time and place for a disposition hearing which shall be separate, distinct and subsequent to the adjudicatory hearing.

Again, it is important to note that M.A.S. failed to timely appeal from the adjudication order or any other order entered as a result of the petition for adjudication. The judgment on appeal is the judgment terminating M.A.S.'s parental rights, which was entered

28

approximately nineteen months following the adjudication order as a result of a hearing on the State's separate petition to terminate parental rights. While this Court recognizes the Mississippi Supreme Court's ruling in *In re C.R.*, 604 So. 2d 1079, 1084 (Miss. 1992), wherein the supreme court remanded that case to the lower court "for failure to follow [Mississippi Code Annotated section 43-21-601] so that a separate and distinct disposition hearing be had as required," there is an important distinction between that case and the case sub judice. In *In re C.R.*, C.R.'s mother perfected her appeal of the adjudication order within the time constraints imposed by statute. *Id*. at 1079-82. In this case, M.A.S. failed to perfect her appeal from the adjudication order or the disposition order.

¶43. Secondly, M.A.S. was represented by counsel throughout the adjudication process and counsel never made an objection to the failure to have a separate disposition hearing. Finally, M.A.S. failed to file any post-trial motions to challenge the youth court's failure to conduct a separate disposition hearing. Therefore, M.A.S. has waived her argument regarding the youth court's failure to comply with Mississippi Code Annotated section 43-21-601(1).

### D. Alternative to Custody

¶44. M.A.S. argues that there was a reasonable alternative to placing the children in the Lamar County CPS's custody. She claims that the youth court erred by continuing to leave the children in the State's custody without sufficient evidence warranting their removal. The Court does note that the children were returned to M.A.S.'s custody for more than ninety

days, until M.A.S. and A.A.S. tested positive for drugs, and the children were removed again. As previously stated, M.A.S. failed to appeal from the initial adjudication order or the disposition order despite the fact that she was represented by counsel throughout the process. M.A.S. has waived her claim challenging the sufficiency of the evidence presented in the adjudication proceedings and therefore will not be discussed further.

## II. Did the youth court lack jurisdiction over the TPR action?

¶45. M.A.S. alleges that because she was not properly served with process pursuant to Rule 81(d)(1) of the Mississippi Rules of Civil Procedure and Mississippi Code Annotated section 93-15-107(1)(b) (Supp. 2017), the youth court lacked jurisdiction over the TPR hearing. She further alleges that the youth court failed to comply with Mississippi Code Annotated section 93-15-113(2) (Supp. 2017) and that she and A.A.S. were not advised of their rights pursuant to the statute.

¶46. M.A.S. correctly states in her brief that "[a] termination proceeding shall be triable . . . thirty (30) days after personal service of process to any necessary party . . . ." *See* Miss. Code Ann. § 93-15-107(1)(b); *accord* M.R.C.P. 81(d)(1). In this case, the youth court docket shows that the petition to terminate parental rights was filed on August 12, 2019. The docket also shows that a summons was issued for M.A.S. on September 16, 2019, for the TPR hearing set for October 22, 2019.[14] Additionally, there is a docket entry on September 21, 2019, that states, "Summons to [M.A.S] personally served for terminate parental rights

_____

[14] The actual summons issued to M.A.S. on September 16, 2019, was included in the supplemental record.

hearing on 22-Oct-2019." According to the youth court docket, a subsequent summons was issued for M.A.S. on October 22, 2019, for a TPR hearing on December 10, 2019.[15] A docket entry on October 24, 2019, states "Summons to [M.A.S.] personally served for terminate parental rights hearing on 10-Dec-2019."

¶47. M.A.S. argues that the record is void as to any transcripts from a hearing on October 22, 2019, or an order continuing the TPR hearing from October 22, 2019, to December 10, 2019, and therefore as a result, ultimately lost jurisdiction over M.A.S. However, the supplemental record in this case included three "orders granting motion to continue an existing hearing" dated October 22, 2019, wherein the youth court ordered in part:

> That previous process of the Court shall remain in full force and effect and that all persons previously served with process to attend the hearing originally set for October 22, 2019 9:30 AM be and hereby are ordered to attend the hearing set for December 10, 2019 9:15 AM.

Regardless of the existence of a continuance order, the youth court docket reflects that M.A.S. was personally served with process for the TPR hearing scheduled for December 10, 2019, well-within the time frame required by Rule 81(d)(1) and section 93-15-107(1)(b). Further, M.A.S. was present at the TPR hearing on December 10, 2019, and actively participated in the hearing. Notably, there were no objections to personal service of process at the TPR hearing. M.A.S.'s argument is without merit.

¶48. M.A.S. further argues on appeal that the youth court erred by not complying with

---

[15] The actual summons issued to M.A.S. on October 22, 2019, and return with proof of service were included in the supplemental record.

Mississippi Code Annotated section 93-15-113(2) and failed to explain certain rights including the right to counsel, the right to remain silent, the right to subpoena witnesses, the right to confront witnesses, and the right to appeal at the beginning of the TPR hearing. Neither M.A.S. nor A.A.S. made any objections at the hearing, and the court proceeded with M.A.S. testifying on her own behalf.

¶49.    While the youth court did not address all the rights set forth in Section 93-15-113(2) at the beginning of the TPR hearing, the court did address M.A.S.'s right to an attorney and right to appeal at the onset of the hearing when it considered her motion for a continuance. The youth court stated in part:

> All right. Well, we're going to proceed today. Again, this Court did give you the opportunity to retain counsel. You apparently have not done so. So we're going to proceed today without the benefit of counsel. And if you want to hire a lawyer and appeal this, you can.

Before M.A.S. and A.A.S. had the opportunity to cross-examine the State's first witness, the court stated:

> [M.A.S. and A.A.S.], I want to explain a couple of things to you before I allow you the opportunity to cross-examine this witness. I've already talked to you about your right to have an attorney present. We've gone over all of that. You also do have the right to remain silent and not speak. You also have the right to cross-examine witnesses like the social worker here and the right to subpoena witnesses. You also will have the right to appeal my decision if you are not happy with it, and a copy of the transcript provided to you. I want to make sure you understand those rights before you start engaging in this case.

Even though the youth court did not address M.A.S.'s rights at the beginning of the TPR hearing, they were in fact addressed. M.A.S. does not allege with any specificity any

prejudice that occurred as a result of the timing of the court's explanation of the rights set forth in Section 93-15-113(2).

¶50. Similarly, in *Blakeney v. McRee*, 188 So. 3d 1154, 1160 (¶16) (Miss. 2016), the supreme court considered the failure of the chancery court to make an on-the-record determination of whether a biological father was entitled to court-appointed counsel before allowing him to proceed pro se in an adoption proceeding. In that case, the supreme court determined that the failure to do so was harmless error; it was clear from the record that the biological father received a fair and adequate hearing, and the presence of an attorney would have been inconsequential.

¶51. In the case sub judice, the youth court substantially complied with the requirements set forth in Mississippi Code Annotated section 93-15-113(2). Further, M.A.S. failed to show with any specificity what, if any, prejudice occurred as a result of the timing of the court's explanation of the rights set forth in the statute. We find no error by the youth court and this issue is without merit. *Id*. at 1160-61 (¶¶16-18).

### III. Did the youth court err in finding that there was clear and convincing evidence to terminate M.A.S.'s parental rights?

¶52. On appeal, M.A.S. alleges that the youth court erred in finding that the State provided clear and convincing evidence to substantiate the termination of her parental rights. More specifically, M.A.S. claims that the GAL failed to conduct an independent investigation and zealously represent the best interest of the children. She further alleges that the testimony and evidence presented at trial was insufficient to prove that M.A.S. suffered from habitual

33

alcoholism or other drug addiction or that there was deep-seated antipathy by the children or substantial erosion of the relationship between her and the children.

### A. Sufficiency of GAL Investigation

¶53.    On appeal, M.A.S. challenges the sufficiency of the GAL appointment and calls into question the fact that the order appointing the GAL and the GAL's report were entered on the same day as the TPR hearing.  Further, she argues that the GAL's report was inadequate because it was silent as to "any actual independent investigation performed by the GAL and silent as to ever speaking with the minor children, the mother, or the fathers."

¶54.    M.A.S. correctly states in her brief that the appointment of a GAL is mandatory in actions to terminate parental rights pursuant to Mississippi Code Annotated section 93-15-107(1).  Pursuant to statute, Cynthia Re was appointed as the GAL.  Re submitted a report and testified at the TPR hearing.  At the hearing, M.A.S. failed to make any objections or file any post-trial motions in objection to the GAL's investigation.

¶55.    In *Kirkley v. Jackson County Department of Child Protection Services (In re J.K.)*, 304 So. 3d 184, 193 (¶27) (Miss. Ct. App. 2020), this Court addressed a similar argument made by the biological father for the first time on appeal, stating:

> At trial, Kirkley's attorney did not object to the sufficiency of the investigation conducted by the GAL; nor did he file any post-trial motions concerning the GAL investigation or lack thereof.  Consequently, because the issue is now raised for the first time on appeal, the youth court never had an opportunity to address it . . . because the findings in the GAL's report are consistent with the evidence and Kirkley's own testimony, we find that, in this instance, any alleged failure by the GAL to visit with Kirkley or John independently does not warrant either vacating the youth court's termination of Kirkley's parental

34

rights or a remand for further proceedings. This argument is without merit.

¶56. In the case sub judice, M.A.S. waived her argument concerning the sufficiency of the GAL's investigation because there was no objection made at the hearing; this issue is raised for the first time on appeal. Notwithstanding her waiver, M.A.S.'s claim is without merit. Re was appointed as the GAL for M.A.S.'s children in January 2019, approximately eleven months before the TPR hearing. Prior to the TPR hearing, M.A.S. attended two additional review hearings concerning the custody of A.S., B.S., and C.S. on June 18, 2019, and September 24, 2019. While Re's report does not identify the breadth of her investigation and what individuals she interviewed, her testimony at trial revealed her knowledge about the case. Re testified about the contents of the voluminous CPS reports prepared and reviewed throughout the adjudication process. According to Re, "I have been following this case. These children want some permanency." In her testimony Re also alluded to an interview with the foster mother Sherrie Vapore and stated, "Contrary to what [M.A.S.] testified to, **when I spoke with Ms. Sherrie Vapore**, who is the foster parent . . . she hadn't heard from them since . . . October of '18." (Emphasis added). While the GAL's report may have been silent as to "any actual independent investigation," as M.A.S. argued, that does not automatically suggest that there was not a proper investigation conducted.

### B.    Habitual Alcoholism or Other Drug Addiction

¶57. M.A.S. claims that the evidence presented at the TPR hearing was not sufficient to terminate her parental rights pursuant to Mississippi Code Annotated section 93-15-121(c).

She asserts that the State failed to prove that she suffered from a drug addiction or that she failed to comply with any drug or alcohol treatment.

¶58. The grounds for involuntary termination of parental rights are governed by statute. Mississippi Code Annotated section 93-15-121(c) states that termination of parental rights is appropriate if it can be proved by clear and convincing evidence that "[t]he parent is suffering from habitual alcoholism or other drug addiction and has failed to successfully complete alcohol or drug treatment[.]"

¶59. Both the CPS worker and the GAL testified at the TPR hearing regarding M.A.S.'s long history with drug abuse. At least two of M.A.S.'s children have been affected by her drug abuse literally since birth, which was evidenced by the fact that they were born with marijuana in their systems. The CPS social worker Torjai Ashford testified that M.A.S. and A.A.S. both had a history of drug use and that drug abuse was ongoing. She testified:

> Also, we had received like, twenty-seven reports on this family of **drug use**, not going to school, deplorable home, you know, no utilities working in the home. And four of those was substantiated. **Two of those kids were born with marijuana in their system**. This was part of the findings.

(Emphasis added). Further, the record reflects that CPS had been receiving reports for years, alleging abuse and neglect relating to M.A.S.'s drug use and her driving under the influence among other allegations of neglect. While the record is unclear as to the exact circumstances surrounding the children's previous removal from M.A.S.'s home in June of 2015, Ashford testified that M.A.S.'s most current family service plan included random drug screens because of her drug history. According to Ashford, M.A.S. did not complete the goals and

36

tasks assigned in the plan. More specifically, the family service plan stated that M.A.S. should "submit to random drug screens **twice per month at Court Programs**. Parent **must remain drug free for all substances**." (Emphasis added). The agency made efforts to send M.A.S. to take random drug screens on the following dates: July 9, 2018; August 2, 2018; September 14, 2018; September 28, 2018; October 6, 2018; October 31, 2018; November 7, 2018; November 14, 2018; November 26, 2018; December 7, 2018; and December 10, 2018. M.A.S. did not take any of the drug screens listed above. Ashford testified that when M.A.S. and A.A.S. finally submitted to a drug screen on December 11, 2018, both parents tested positive for multiple drugs including marijuana, amphetamines, and methamphetamine. The failed drug screen results were entered into evidence as Exhibit 2 at the TPR hearing. When she was asked to elaborate on why the service plan for M.A.S. and A.A.S. changed, Ashford testified:

> The parents were asked to take random drug screens. They did not take random drug screens. They kept refusing to take those. The only reason they took the one in December was because they were ordered by the Judge when they left the courtroom. They had to go right there and take the drug screen. . . . They just wouldn't comply with us. . . . I mean, it was so many drug screens. It was at least twice a month that they refused. And I would beg [M.A.S.] to go. Please, I'd say. Your kids are going to be removed if you don't. All she would do was cry.

M.A.S. claimed that she and A.A.S. did complete a urine test at Court Programs as requested, and she stated that those screens were negative. However, there is no proof of those test results in the record. There is proof in the record that CPS received a report that M.A.S. and A.A.S. were using their niece's urine to pass drug screens. Similarly, Ashford testified that

37

M.A.S. had provided her with a fake drug test result.

¶60. The GAL also testified regarding M.A.S.'s drug use and stated in part:

> [M.A.S. and A.A.S.] are suffering from a drug addiction and have **failed to successfully complete drug or alcohol treatment as directed by the Court**. There have been refused drug screens back in June of 2018. There is no show or no appearance for the requested drug screens of July 9 or August 2. Then the December 11, 2018, drug screen showed positive for methamphetamines and amphetamines.

(Emphasis added). Again, while M.A.S. claimed that she had taken a few negative drug tests throughout the adjudication process, she did not provide the youth court proof of any of those tests at the TPR hearing. Further, by her own admission during cross-examination, M.A.S. did not deny the fact that she had some issues with drug use. Finally, in its ruling on the record, the court stated in part, "The Court has always had concerns about their drug addiction. Those concerns, I believe, by clear and convincing evidence have been established in this hearing."

¶61. Similarly, in *In re J.K.*, 304 So. 3d at 186 (¶1), Merle Kirkley appealed the termination of his parental rights. One of Kirkley's arguments on appeal was that the youth court erred in finding there was clear and convincing evidence to support the termination of his parental rights partly due to his habitual drug use and failure to complete drug treatment. *Id*. at 194 (¶¶30-31). This Court held in part that "Kirkley had an opportunity to demonstrate that he 'could maintain a stable, drug free lifestyle,' but he continued to use drugs and 'engage in criminal behavior.'. . . Accordingly, we find the court did not err in finding 'by clear and convincing evidence' that it was in the child's best interest to terminate Kirkley's parental

38

rights." *Id*. at 195 (¶¶36-37).

¶62.    In this case, according to the testimony of both Ashford and Re, M.A.S. was given multiple opportunities to prove her sobriety to the court and comply with the service agreement and failed to do so.  Given the cumulative, clear, and convincing evidence presented at the TPR hearing, this issue is without merit. The youth court did not err by finding clear and convincing evidence that M.A.S.'s rights should be terminated pursuant to Mississippi Code Annotated section 93-15-121(c).

### C.    Deep-seated Antipathy by the Child or Some Other Substantial Erosion of the Relationship Between the Parent and Child

¶63.    Finally, M.A.S. claims that the evidence presented at the TPR hearing was not sufficient to terminate her parental rights pursuant to Mississippi Code Annotated section 93-15-121(f).  She asserts that the State failed to prove that there was a deep-seated antipathy by the children toward her or an otherwise substantial erosion of her relationship with the children.

¶64.    In *L.O. v. G.V.*, 37 So. 3d 1248, 1254 (¶23) (Miss. Ct. App. 2010), this Court stated, "[S]ection 93-15-103(3) is clear that only one ground is necessary to terminate parental rights."  Because we find no error in the youth court's finding that there was clear and convincing evidence to terminate M.A.S.'s parental rights pursuant to Mississippi Code Annotated section 93-15-121(c), a further analysis of M.A.S.'s argument regarding section 93-15-121(f) and the sufficiency of evidence is not necessary.

## CONCLUSION

¶65. After review of the record, we find no error in the youth court's decision to terminate M.A.S.'s parental rights. Therefore, the second amended judgment of the youth court dated January 28, 2020, is affirmed.

¶66. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS AND SMITH, JJ., CONCUR. LAWRENCE, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J.; LAWRENCE, J., JOINS IN PART.**

**McCARTY, J., DISSENTING:**

¶67. The Youth Court terminated the parents' rights at a hearing where their rights were not explained to them and where they were without a lawyer. Because the Legislature has mandated that parents be advised of their rights and, where applicable, have appointed counsel, I must respectfully dissent.

¶68. "In 2016, the Mississippi Legislature enacted the Mississippi Termination of Parental Rights Law." *Miss. Dep't of Child Prot. Servs. v. Bynum*, 305 So. 3d 1158, 1161 (¶4) (Miss. 2020). The law directly addresses one of the most important rights in our society. "The liberty . . . interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). And "[i]n Mississippi . . . there exists a strong presumption in favor of preserving parental rights." *In re A.M.A.*, 986 So. 2d 999, 1009 (¶22) (Miss. Ct. App.

2007).

¶69. Accordingly, the Legislature has decreed that the trial court itself must make a check of three critical issues "[a]t the beginning of the involuntary termination of parental rights hearing[.]" Miss. Code Ann. § 93-15-113(2)(a) (Rev. 2018). First, "the court *shall* determine whether all necessary parties are present and identify all persons participating in the hearing[.]" *Id.* (emphasis added). Second, "the court *shall* . . . determine whether the notice requirements have been complied with and, if not, determine whether the affected parties intelligently waived compliance with the notice requirements[.]" *Id.* (emphasis added). Third, "the court *shall* . . . explain to the parent the purpose of the hearing, the standard of proof required for terminating parental rights, and the consequences if the parent's parental rights are terminated." *Id.* (emphasis added).

¶70. These three critical points must be addressed before *anything happens at all in the hearing*. The law says "[a]t *the beginning* of the involuntary termination of parental rights hearing," not in the middle, or at some point after the first witness is called, but "[a]t the beginning." *Id.* (emphasis added).

¶71. Furthermore, at the "beginning of the involuntary termination of parental rights hearing . . . [t]he court *shall* also explain to the parent" five rights:

(i) The right to counsel;

(ii) The right to remain silent;

(iii) The right to subpoena witnesses;

41

(iv) The right to confront and cross-examine witnesses; and

(v) The right to appeal, including the right to a transcript of the proceedings.

*Id.* (emphasis added).

¶72.    There is a reason the word "shall" is so vital.  As established, the termination proceeding scrapes against a key liberty interest of parents.  And both this Court and the Mississippi Supreme Court have many times concluded that the word "shall" is mandatory. "A basic tenet of statutory construction constrains us to conclude that, unlike the discretionary nature of 'may,' the word 'shall' is a ***mandatory*** directive." *Ivy v. Harrington*, 644 So. 2d 1218, 1221 (Miss. 1994) (extreme emphasis by the Supreme Court).  In that case, the Supreme Court concluded that the Legislature's usage of the word "shall" was in effect a mandate in a paternity case because the invocation of "shall" meant "***no discretion*** is afforded the trial judge." *Id*. (emphasis again by the Supreme Court).

¶73.    In acknowledging that words must have meaning, our courts must apply the word "shall" faithfully, in accord with "our constitutional mandate to faithfully apply the provisions of constitutionally enacted legislation." *Univ. of Miss. Med. Ctr. v. Easterling*, 928 So. 2d 815, 820 (¶23) (Miss. 2006) (requiring adherence to the Legislature's ninety-day pre-suit warning in Mississippi Tort Claims Act cases).

¶74.    As the majority acknowledges, the trial court did not fulfill its statutory duty under the law. The Youth Court perhaps impliedly "determine[d] whether all necessary parties [were] present and identif[ied] all persons participating in the hearing[,]" but a full check of service

of process on the parents was not made. *See* Miss. Code Ann. § 93-15-113(2)(a). Another notable deviation at the outset of the hearing was that the Youth Court utterly failed to "explain to the parent the purpose of the hearing, the standard of proof required for terminating parental rights, and the consequences if the parent's parental rights are terminated." *Id*.

¶75. The law was simply not followed. The very risks of the hearing itself were not told to the parents. Under *Ivy*, there is "no discretion" afforded a trial court to ignore this statute.

¶76. As the majority further explains, at some point the parents were told of their five rights applicable to a termination hearing. However, as the mother argues on appeal, "[a]t this time during the hearing, the State had already concluded direct questioning of their first witness and the [Y]outh [C]ourt had received and marked into evidence 4 exhibits and engaged with the parents as to any objection to admissibility." In other words, the car had already left the garage.

¶77. And as also set out by the majority, the termination proceeding happened while the parents were without legal counsel. In resolving this clear constitutional error, the majority relies on a case from the Supreme Court where it found "the chancellor in this case erred in not making an on-the-record determination . . . whether [the father] was entitled to court-appointed counsel before allowing him to proceed pro se" in a termination proceeding. *Blakeney v. McRee*, 188 So. 3d 1154, 1160 (¶16) (Miss. 2016). The Court found "the failure to do so was harmless error, as it is clear from the record that [he] was given a fair and

43

adequate hearing, and the presence of an attorney would not have made a difference." *Id*.

¶78.    There is a key distinction between that case and this one: the parents here *did* have a lawyer appointed, but the trial court refused to continue the case so that their court-appointed lawyer could be present.  At the beginning of the termination hearing that would result in her losing her children, the mother told the trial court, "I have been approved for the attorney for the Legal Aid, but they said due to the holidays and stuff like that"—with the hearing taking place on December 10—"they will not have an attorney available until the first of the year in January."  The mother was told that she should ask the trial court "to keep my case open and for me to ask the Court for a continuance so they can get [me] an attorney."

¶79.    Despite that the mother was indigent, despite that she had been cleared for an appointed attorney, and despite that the reason here—proximity to the holidays—was in good faith, the trial court kept its foot on the gas and refused to continue the case.  To force the parents to proceed with a hearing with witnesses when they were not properly informed of the risks or provided their legal rights under the law is clear error.

¶80.    Given the proof in this record, it seems apparent the parents should have had their rights terminated.  Yet that result cannot come at the cost of violating constitutional rights and state law.  Because the trial court did not follow the Legislative mandate of advising the parents of their rights, coupled with forcing the hearing to proceed while the parents lacked counsel, I believe we must reverse and remand:  reverse because we must not abide parents losing their children absent due process, remand to allow them legal counsel at the hearing

44

where "perhaps the oldest of the fundamental liberty interests recognized" in our country is

at stake.

**McDONALD, J., JOINS THIS OPINION. LAWRENCE, J., JOINS THIS OPINION IN PART.**